**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **REBECCA POOLE-WARD, M.D.,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **Vs.** | § | **Civil Action No. 4:17cv885** |
| | § | |
| **AFFILIATES FOR WOMEN'S** | § | **Jury Requested** |
| **HEALTH, P.A.,** | § | |
| **Defendant.** | § | |

**PLAINTIFF'S ORIGNIAL COMPLAINT**

**<u>Introduction</u>**

1.    Defendant Affiliates for Women's Health, P.A. ("AWH") violated the ADAAA, 42 U.S.C. §12101, et seq., by discriminating, denying accommodation, and retaliating against its employee Rebecca Poole-Ward, M.D. ("Dr. Poole") because of her disabilities.  In addition, or in the alternative, AWH breached its contract with Dr. Poole by terminating Dr. Poole in violation of the terms of its contract with Dr. Poole.

2.    Dr. Poole brings her claims against AWH for its violations of the ADAAA seeking compensatory damages, punitive damages, emotional damages, loss of enjoyment of life, loss of career opportunity, loss of reputation, humiliation, equitable relief, back pay, front pay, lost retirement benefits, additional lost employment benefits, loss of consortium, and attorney's fees and costs.

3.    Dr. Poole brings her claims against AWH for its breach of contract seeking direct damages, consequential damages, and attorney's fees and costs.

**<u>Jurisdiction and Venue</u>**

4.    The Court has jurisdiction under 28 U.S.C. §1331 (federal question), under 28 U.S.C. §1343 (civil rights), and 28 U.S.C. §1367 (supplemental jurisdiction).

5.    The acts or omissions made the basis of this suit occurred in Brazos County, Texas and in this judicial district, so venue is proper in this Court under 28 U.S.C. §1391(b)(2).

6.    All conditions precedent have been exhausted and/or performed prior to the filing of the ADAAA claims.  In particular: (a) Dr. Poole filed a charge of discrimination on these issues with the U.S. Equal Employment Opportunity Commission ("EEOC") within 300 days of the date of the recoverable adverse employment actions complained of herein which began on May 21, 2015; (b) a federal right-to-sue letter from the EEOC was received by Dr. Poole no earlier than December 22, 2016; and (c) Dr. Poole filed her original complaint in this action within 90 days of her receipt of the right-to-sue letter. See Charge and Right to Sue Letter attached as Ex. A

7.    Dr. Poole provided AWH with notice of her breach of contract claim no later than on January 29, 2016, thus providing AWH with substantial notice exceeding state law requirements.  AWH has yet to respond to Dr. Poole's notice of claims or settlement demand. See Contract attached as Ex. B.

**Parties**

8.    Dr. Poole is a citizen of the United States and the State of Missouri and resides in Missouri. Dr. Poole may be contacted through her attorney of record in this cause.

9.    AWH is a professional association operating in Brazos County, Texas and may be served through its registered agent, Randy W. Smith, M.D. at 1602 Rock Prairie Rd., Suite 430, College Station, TX 77845.  AWH has three partners/members: Randy

Smith, M.D. ("Dr. Smith"), Michele Garant, D.O. ("Dr. Garant"), and Benjamin Zivney, M.D. ("Dr. Zivney").

### Factual Allegations

10.  Dr. Poole is a medical doctor who is and has been qualified to perform the duties of her job with AWH during all relevant times to this litigation.

11.  Dr. Poole began working for AWH as a medical doctor in the specialty of obstetrics and gynecology on October 1, 2014 pursuant to a contract with AWH (Ex. B) executed on July 11, 2014.  The contract was modified so that Dr. Poole started on October 1st rather than August 1st due to a delay in licensing not related to the conduct of either Dr. Poole or AWH.

12.  Dr. Poole began her work with AWH with two preexisting disabilities that Dr. Poole had been evaluated for and diagnosed with and thereafter successfully managed since her childhood: Attention Deficit Hyperactivity Disorder ("ADHD") and migraine headaches ("migraines").

13.  Dr. Poole had disclosed her two pre-existing disabilities and her need for minor accommodations to AWH on several occasions to include her need to take medication and occasionally require time off to receive either treatment or merely rest and recuperate depending on the severity of the episode she might have experienced.

14.  AWH did not express any opposition in granting Dr. Poole's requests for these minor and rare accommodations related to her ADHD and migraines at any time prior to March 2015.

15.  Dr. Poole's performance of her duties, conduct, and otherwise contribution to the practice, progressed well.  Dr. Poole's efforts increased the profits and reputation of

AWH in the community during the entire time that Dr. Poole worked for AWH including through to the date that AWH terminated Dr. Poole's employment on June 8, 2015.

16.   On or about the evening of February 21, 2015, Dr. Poole was criminally assaulted and as a direct result of that assault, Dr. Poole began to suffer from the many and varied symptoms of, and was later formally diagnosed with, post traumatic stress disorder ("PTSD").

17.   Dr. Poole is a person with disabilities (actual, record of, and/or regarded as) as defined by the ADAAA, 42 U.S.C. § 12102(2)(A).

18.   The ADAAA requires that disability be broadly construed and be assessed in its active state and without the benefit of mitigating measures. 42 U.S.C. § 12102, et seq.

19.   In that light, Dr. Poole's disabilities substantially limited several major life activities, including among others: working, sleeping, caring for herself, and interacting with others.

20.   The physical manifestations Dr. Poole experienced, included among others: head aches, weight loss, difficulty sleeping, emotional anxiety, paranoia, flash backs, and fear in certain circumstances.

21.   Dr. Poole was at all times a qualified individual as defined by the ADAAA.

22.   AWH is a qualified employer as defined by the ADAAA.

23.   Dr. Poole successfully performed her job duties as reasonably assigned, reasonably accommodated, and available to her until she was terminated.

24.   At no time during Dr. Poole's employment with AWH did Dr. Poole ever fail or refuse to perform reasonable work-related tasks that were reasonably assigned to her by AWH.

**Dr. Poole-Ward's Original Complaint**                                                          **4**

25.  If Dr. Poole was unable to perform a work-related task or assignment, it was as a result of her requiring sick leave like any employee, her disabilities (i.e., needed reasonable accommodation(s)), or as a direct result of unreasonable acts or omissions by AWH.

26.  Dr. Poole initially disclosed the underlying facts of the assault and her resulting severe PTSD symptoms to AWH through Dr. Garant, AWH's only female partner.

27.  Dr. Poole specifically asked Dr. Garant not to tell Dr. Smith and Dr. Zivney the details of the assault; although Dr. Poole acknowledged to Dr. Garant that Dr. Garant would need to tell Dr. Smith and Dr. Zivney that she was unwell and would need to miss some work, but Dr. Poole reiterated with Dr. Garant that Dr. Garant would not need to go into the details of the assault with them.

28.  Despite the fact that this communication from Dr. Poole involved confidential medical and sensitive personal information, Dr. Garant violated Dr. Poole's request and disclosed the details of the assault on Dr. Poole to Dr. Smith and Dr. Zivney.

29.  Shortly after Dr. Poole returned to work following the assault, Dr. Poole learned that employees of AWH were also aware of details of the assault from AWH, even though she had not made those disclosures and there would be no legitimate basis for AWH partners to disclose those details to the employees.

30.  As a result of these unjustified disclosures by AWH to the employees, Dr. Poole was then subjected to multiple incidents of being confronted by these individual employees and partners with insensitive, needless, or callous questions about the details

**Dr. Poole-Ward's Original Complaint**                                          **5**

of the assault. These questioning events triggered strong negative emotional reactions in Dr. Poole.

31. Dr. Poole sought and received treatment from a licensed psychologist, regarding her PTSD symptoms as well as the impact that those symptoms had on her pre-existing disabilities. Dr. Poole also consulted with her primary care physician who was involved and aware of her condition and treatment therapies.

32. Dr. Poole informed AWH that her therapist recommended that she return to work as a positive therapeutic activity, as long as Dr. Poole felt up to it. In accord with this advice, Dr. Poole also asked AWH for several other accommodations on multiple occasions to make the workplace a viable positive activity to assist Dr. Poole in addressing the attendant symptoms she experienced, including the following:

- Time to rest or recuperate from her migraine headache episodes,
- Ability to take medication for her ADHD, migraine, or PTSD, as required,
- Time to attend treatment appointments with her doctor(s) for her PTSD,
- For Dr. Zivney not to wear a particular wristwatch that he owned that was similar to the watch that one of the assailants had worn when Dr. Poole was assaulted,[1]
- For AWH partners and employees not to discuss the details of the assault with Dr. Poole or with other staff unless required for some business-specific reason to reduce the anxiety resulting from the PTSD,
- Reducing the number of times and circumstances upon which Dr. Poole was called in to assist after hours to only required emergencies, rather than merely a convenience or preference, due to her difficulty sleeping as a result of the PTSD, and
- Switching on-call coverage or allowing time for Dr. Poole to rest or recuperate if Dr. Poole experienced a particularly severe PTSD event that resulted in an excessive loss of sleep.

---

[1] Dr. Poole specifically stated to AWH that when she saw that particular watch, that it would trigger flashbacks to the assault and therefore, she asked that Dr. Zivney not wear that particular watch to work to reduce the anxiety that the watch triggered in Dr. Poole due to her PTSD.

**Dr. Poole-Ward's Original Complaint**                                                           **6**

33.  AWH granted some of Dr. Poole's requested accommodations on some occasions, but AWH denied Dr. Poole the following accommodations without explanation on multiple occasions; without engaging in an interactive dialogue about the requested accommodation; and without providing an explanation or documentation establishing that the requested accommodation was somehow unreasonable, to include the following:

- Time to attend treatment appointments with her doctor(s) for her PTSD,
- For Dr. Zivney not to wear a particular wristwatch that he owned that was like the watch that one of the assailants had worn when Dr. Poole was assaulted,
- For AWH partners and employees not to discuss the details of the assault with Dr. Poole or with other staff unless required for some business-specific reason to reduce the anxiety of the PTSD,
- Reducing the number of times and circumstances upon which Dr. Poole was called in to assist after hours to only required emergencies, rather than merely a convenience or preference, due to her difficulty sleeping as a result of the PTSD, and
- Switching on-call coverage or allowing time for Dr. Poole to rest or recuperate if Dr. Poole experienced a particularly severe PTSD event that resulted in an excessive loss of sleep.

34.  AWH engaged in the following disability-based discriminatory or retaliatory conduct when interacting with Dr. Poole at or near the time that Dr. Poole was denied accommodations and subjected to adverse employment actions to include her termination, which include but are not necessarily limited to the following:

- Ridiculing Dr. Poole for needing time to sleep or recuperate as being evidence that she must be suffering from a psychological problem and therefore she should stop working for AWH,
- Stating that Dr. Poole was only thinking of herself and not of the partners when Dr. Poole was asking for her accommodations, and
- Stating, without any reasonable factual, medical, or professional basis for doing so, that Dr. Poole had more disabilities than was credible for any one person to have (thus taking the position that Dr. Poole was faking or lying about her disabilities and need for accommodations).

35.   On May 20, 2015, AWH denied Dr. Poole's request for a switch of on call shifts with her so that Dr. Poole's on call shift scheduled for the next night, May 21, 2015, could be covered.  Dr. Poole had specifically informed AWH that Dr. Poole was experiencing an excessive lack of sleep due to the fact that her husband had been and would continue to be out of town for several days, which triggered great anxiety and fear in Dr. Poole at night due to her PTSD.

36.   In denying this accommodation on May 20th for the May 21st schedule, AWH did not engage in an interactive dialogue or otherwise provide any legitimate reason for refusing to grant the accommodation or explain what was unreasonable about the request from Dr. Poole.

37.   At no time did Dr. Poole ever take medication that was not prescribed for her or not in accord with her prescriptions.

38.   At no time did AWH ever become personally aware that Dr. Poole had ever taken medication that was not prescribed for her or not in accord with her prescriptions.

39.   At no time on May 21, 2015 did AWH ever personally observe Dr. Poole acting in a way that could reasonably be represented as having taken medication that was not prescribed for her or not in accord with her prescriptions.

40.   At no time did anyone ever report to AWH that Dr. Poole had taken medication that was not prescribed for her or not in accord with her prescriptions.

41.   At no time on May 21, 2015 did any nurse or hospital employee ever report to AWH that they believed that Dr. Poole had taken medication that was not prescribed for her or not in accord with her prescriptions or was otherwise intoxicated while she was working that day.

**Dr. Poole-Ward's Original Complaint**                                                                                    **8**

42.  At no time on May 21, 2015 did any patient ever report to AWH that they believed that Dr. Poole had taken medication that was not prescribed for her or not in accord with her prescriptions or was otherwise intoxicated while she was working that day.

43.  At no time on May 21, 2015 did AWH ever take any steps to personally check on Dr. Poole's welfare or condition.

44.  On May 21, 2015 at about 8:45 pm, Dr. Poole called AWH to inform AWH that Dr. Poole was in the ER for personal medical treatment and that Dr. Poole needed AWH to cover her on call shift at the hospital that night.

45.  Dr. Poole specifically told AWH that she had injured her ankle earlier in the day at the AWH clinic and although she tried to work through the pain, that the husband of one of her patients, himself a medical doctor, had examined Dr. Poole's ankle and informed Dr. Poole that he believed the ankle to be broken and as a result, the doctor personally wheeled Dr. Poole to the ER for x-rays and treatment.

46.  Dr. Poole specifically mentioned to AWH that she needed her on call shift covered at the hospital that night due to Dr. Poole's injury and her extended lack of sleep due to her PTSD, as had been requested and denied the night before.

47.  AWH granted Dr. Poole's request to cover her on call shift.

48.  However, AWH then also proceeded to falsely, unjustifiably, and unreasonably state to the ER doctor and the hospital house supervisor that Dr. Poole was on drugs.

49.  AWH also specifically recommended that the hospital obtain a urine drug screen ("UDS") sample from Dr. Poole.

50.   AWH had no factual, medical, or professional basis for recommending that a UDS sample be obtained from Dr. Poole that evening on May 21, 2015.

51.   AWH had no employment relationship with either the ER doctor or the house supervisor to justify its false disclosures to them.

52.   Dr. Poole provided a UDS sample that evening, May 21, 2015, but that sample was not tested.

53.   No explanation was ever provided for why Dr. Poole's UDS sample from that evening was not tested.

54.   Dr. Poole returned the next day and again voluntarily provided another UDS sample.

55.   This second sample was sent out for independent testing by the hospital and the outside lab returned a "negative" report confirming that Dr. Poole had no non-prescribed or excessive amounts of prescribed drugs in her system.

56.   As a direct result of AWH's false, unjustified, and unreasonable statements to the hospital ER doctor and house supervisor that Dr. Poole was on drugs, the hospital initiated a peer review of Dr. Poole.

57.   As a direct and consequential result of the initiation of the peer review process by the hospital, Dr. Poole had to refrain from treating patients at the hospital.

58.   Fortunately, and through no assistance from AWH, the hospital CEO, Larry Rodgers ("Mr. Rodgers"), agreed to allow Dr. Poole to voluntarily refrain from treating patients at the hospital until the peer review process initiated by AWH's false, unjustified, and unreasonable report was completed.  This action by Dr. Poole assisted in

mitigating the damages being caused as a direct and proximate result of AWH's false, unjustifiable, and unreasonable actions.

59.  It was both common knowledge among medical doctors and specifically communicated to AWH by Dr. Poole multiple times verbally, and in writing, as well as communicated in writing from Dr. Poole's attorney, and also from the CEO of the hospital to an agent of AWH, that if, in the alternative, Dr. Poole saw patients at the hospital, she would have her medical privileges formally suspended by the hospital, also known as summary suspension, and Dr. Poole would have had to report that to the state medical board.

60.  AWH was aware that a report of summary suspension of hospital privileges against Dr. Poole to the state medical board would then be on Dr. Poole's permanent license record and would thereafter have to be disclosed by Dr. Poole to future employers and hospitals regardless of whether Dr. Poole was ultimately exonerated or not.

61.  Additionally, and in line with Dr. Poole's information and belief that AWH's original intent in making the false report would result in a basis for its termination of Dr. Poole, since a summary suspension could be asserted as a breach her contract with the hospital, and thereby with the practice.

62.  Had AWH not made the false, unjustified, and unreasonable report of drug use to hospital staff, there would have been no peer review initiated and Dr. Poole would still have been able to treat patients at the hospital.

63.  Even though AWH did not have any reasonable basis to accuse Dr. Poole of drug use, AWH removed all of Dr. Poole's access to her keys to the facilities and access

to medical records, thus precluding Dr. Poole from providing reasonable medical care to any patients at the hospital or the AWH clinic through no fault of Dr. Poole.

64.   Even though AWH had unjustifiably and unreasonably created the situation preventing Dr. Poole from treating patients at the hospital, Dr. Poole still offered to take as many phone calls and see AWH clinic patients as she could to even out the resulting work burden on the three AWH partners who would have to cover the on-call and other patient schedules at the hospital until the peer review was completed.

65.   Despite Dr. Poole's voluntary offer to work anywhere other than the hospital, the fact that there was no evidence to support any suspicion that Dr. Poole had been on drugs at that time or at any other time, and that AWH had the ability to verify the falsity of the allegation prior to the report to the ER doctor and the house supervisor, AWH rejected Dr. Poole's offer without providing any explanation, legitimate or otherwise.

66.   Despite having no evidence of misconduct against Dr. Poole, AWH held three meetings between the available AWH partners and Dr. Poole about Dr. Poole's disabilities, treatment protocols for her disabilities, requests for accommodations, and work schedule and assignments.

67.   During these meetings, AWH made several false statements and badgered Dr. Poole and unreasonably and unjustifiably accused her of providing false and conflicting information as a means of AWH fabricating evidence of misconduct against Dr. Poole upon which AWH would rely to fabricate a discriminatory, retaliatory, or pretextual basis to terminate Dr. Poole.

68.   During these meetings, Dr. Poole discussed her disability, her need for accommodation, AWH's denials of those accommodations, AWH's unjustified and

unreasonable actions against Dr. Poole, and that AWH criticized Dr. Poole for her disabilities and specifically ridiculing Dr. Poole for her requests for accommodation as being Dr. Poole only thinking of herself and not thinking of the AWH partners.

69.  Dr. Garant never disclosed to Dr. Poole that Dr. Garant was disabled or needed accommodations.

70.  Dr. Smith never disclosed to Dr. Poole that Dr. Smith was disabled or needed accommodations.

71.  Dr. Zivney never disclosed to Dr. Poole that Dr. Zivney was disabled or needed accommodations.

72.  Both during the time of, and after, these meetings with Dr. Poole that were conducted by AWH, AWH refused to allow Dr. Poole time off to heal from the broken ankle or to work for AWH everywhere but the hospital, at least until the peer review process was finally completed.

73.  AWH has no reasonable basis for refusing to allow Dr. Poole to heal her broken ankle and no basis to restrict her from working at the AWH clinic.

74.  During this period, AWH feigned its refusal to believe Dr. Poole when she informed AWH that the hospital CEO had not suspended her privileges and had only asked that Dr. Poole voluntarily agree not to treat patients at the hospital until the peer review process was completed.

75.  AWH required Dr. Poole to obtain in writing from the hospital CEO a statement that Dr. Poole's privileges had not been suspended by the hospital.

76.  Dr. Poole obtained that statement in writing from the hospital CEO and provided the letter to AWH.

77.   Again feigning ignorance in its communications with Dr. Poole, AWH then unreasonably and repeatedly demanded that Dr. Poole agree to take her scheduled on-call shifts at the hospital (on May 29, 30, 31, June 4, and 8) despite the following facts; all of which were within AWH's knowledge:

- Dr. Poole had to agree with the CEO to voluntarily not treat patients at the hospital until the peer review process was completed,
- AWH had restricted Dr. Poole from access to all medical records of patients, so that even if she were able to treat patients at the hospital, Dr. Poole would not have been able to treat those patients within the standard of care since she would not have access to those patients' medical records, and
- AWH refused to allow Dr. Poole to treat patients at its clinic, even though AWH had no reasonable basis to so restrict Dr. Poole's work.

78.   AWH set up a thinly veiled disability-based discriminatory, retaliatory, or otherwise pretextual basis to terminate Dr. Poole on a very narrow reading of only one provision of AWH's contract with Dr. Poole while ignoring the rest of the contractual terms and the remainder of the circumstances that directly conflict with AWH's duties under its contract with Dr. Poole and disregard of the circumstances created by AWH's false, unjustified, and unreasonable acts and omissions against Dr. Poole.

79.   Specifically, again feigning ignorance of the above issues, AWH terminated Dr. Poole on June 8, 2015 accusing her of failing or refusing to perform her duties in violation of the contract provision, 8.01(4).  Ex. B.

80.   AWH cannot meet its burden to show either that Dr. Poole did not meet her duties under the contract term 1.01 as "reasonably direct[ed]" or that Dr. Poole could reasonably be held to be at fault for not taking her on call shifts at the hospital after May 21, 2015 when the only reason that Dr. Poole could not work her on call shift at the hospital was solely due to Dr. Poole's instruction from the hospital as a result of the peer

review process initiated by the false claims made against Dr. Poole by AWH, and AWH's direct and proximate acts and omissions against Dr. Poole due to her disabilities, requests for accommodation, in retaliation for her protected activities.

81.   The hospital's peer review process cleared Dr. Poole of any misconduct.

82.   When Dr. Poole's disabilities became "too much" for AWH, AWH decided to violate Dr. Poole's right to confidentiality and privacy, deny Dr. Poole reasonable accommodations, make discriminatory comments about her disabilities, create fabricated circumstances to make Dr. Poole appear as though she was refusing to work, and then pretextually terminate Dr. Poole for either discriminatory or retaliatory reasons.

83. Following the termination, Dr. Poole lost access to her contractual pay, access to future partner pay and profit sharing, loan repayment from the hospital, medical and dental insurance benefits, retirement benefits, multiple other economic damages for Dr. Poole and her husband, which negatively impacted Dr. Poole's family income and quality of life, and forced Dr. Poole to incur attorneys' fees and costs associated with defending herself during the peer review and then pursuing her disability discrimination and breach of contract claims.

84.   The unlawful employment practices complained of above were intentional.

85.   Even if AWH is not found to have discriminated or retaliated against Dr. Poole in violation of the ADAAA, AWH can still be held liable for the breach of its contract with Dr. Poole and all such direct and consequential damages associated with that breach as well as attorneys' fees and costs.

86. AWH also retaliated against Dr. Poole by opposing Dr. Poole's accommodations, working against Dr. Poole obtaining replacement employment in College Station, and terminating her employment with AWH.

## Damages

87. Because of statutorily impermissible and willful, if not malicious, acts of AWH, Dr. Poole has suffered loss of income, loss of benefits, loss of career opportunity, loss of career investment, and loss of advancement pursuant to the ADAAA. As a consequence of the unlawful and outrageous and willful, if not malicious, actions of AWH, Dr. Poole seeks to recover damages for humiliation, loss of standing in the community, emotional pain and suffering, inconvenience, loss of enjoyment of life, irritation and mental anguish. Dr. Poole seeks recovery, compensatory, punitive, and equitable (i.e., back pay and front pay) damages, as well as attorney's fees, and costs and pre and post judgment interest in the maximum amounts allowed by law pursuant to ADAAA.

88. Because of AWH's breach of its contract with Dr. Poole, Dr. Poole seeks direct and consequential damages, attorney's fees, and costs.

## Relief Requested

Paragraphs one (1) through eighty-eight (88) of this complaint are incorporated by reference and made a part of Relief One through Relief Five, inclusive.

## EQUITABLE RELIEF

## Relief One

Equitable damages are the only means of securing adequate relief for Dr. Poole. Dr. Poole suffered, is now suffering, and will continue to suffer irreparable injury from

AWH's unlawful conduct as set forth herein until and unless enjoined by the Court through a permanent injunction against under the ADA claim and against AWH pursuant to the remainder of the claims, to include but not be limited to removing documentation of these illegal and false disciplinary actions from her file to include any reference to her termination pursuant to all claims and an order restricting AWH from any disparaging comments or communications regarding Dr. Poole.

### Relief Two

Dr. Poole seeks an award of back pay and front pay, as well as lost retirement damages for the losses of income Dr. Poole has suffered and will continue to suffer as a result of AWH's discriminatory and/or retaliatory-based termination of Dr. Poole on June 8, 2015 pursuant to the ADAAA and breach of contract claims.

### Relief Three

Dr. Poole is entitled to awards of pre- and post-judgment interest on any amounts awarded to her pursuant to all claims.

### LEGAL RELIEF

### Relief Four

Dr. Poole is entitled to compensatory, emotional, expectation, and/or consequential damages due to the illegal conduct of AWH as alleged herein pursuant to the ADAAA and breach of contract claims.

### Relief Five

Dr. Poole is entitled to reasonable attorneys' fees and costs pursuant to the ADAAA and breach of contract claims.

## PRAYER FOR RELIEF

Dr. Poole requests the Court to cause AWH to be cited to appear and answer in this Court, and that upon final hearing, the Court grant to Dr. Poole as follows:

1. Grant Dr. Poole all prospective injunctive relief pursuant to the ADAAA against AWH;

2. Grant Dr. Poole equitable damages of back pay, front pay, and other employment and retirement benefits against AWH (to include prior to and after making partner until Dr. Poole could reasonably be expected to earn as much as she would have had she not been illegally terminated) pursuant to the ADAAA and breach of contract claims;

3. Grant Dr. Poole compensatory (emotional and punitive among others) damages for AWH's acts of discrimination and/or retaliation against her, pursuant to the claims;

4. Grant Dr. Poole direct damages for her lost compensation (to include prior to and after making partner until Dr. Poole could reasonably be expected to earn as much as she would have had she not been illegally terminated) pursuant to her breach of contract claim;

5. Grant Dr. Poole consequential damages for her losses incurred in having to relocate to another state pursuant to her ADAAA and breach of contract claims;

6. Grant Dr. Poole pre and post-judgment interest in the highest lawful amount, pursuant to all claims;

7.  Grant Dr. Poole reasonable attorney's fees, together with his costs, pursuant to all claims; and

8.  Such other and further relief as the Court determines justice and equity so require.

Respectfully submitted,

 /s/ Robert Notzon

Robert Notzon
The Law Office of Robert Notzon
Texas Bar No. 00797934
1502 West Avenue
Austin, Texas 78701
Robert@NotzonLaw.com
(512) 474-7563
(512) 852-4788 facsimile
ATTORNEY FOR PLAINTIFF

# EXHIBIT A



## U.S. Equal Employment Opportunity Commission
## San Antonio Field Office

5410 Fredericksburg Rd
Suite 200
San Antonio, TX 78229
(210) 281-2550
TTY (210) 281-7610
Fax: (210) 281-7690

Respondent: AFFILIATES FOR WOMEN'S HEALTH, P.A.
EEOC Charge No.: 451-2016-01505
FEPA Charge No.:

March 28, 2016

Rebecca Poole
4807 Spicewood Springs Road
Building 1, Ste 1245
Austin, TX 78759

Dear Ms. Poole:

This is with reference to your recent written correspondence or intake questionnaire in which you alleged employment discrimination by the above-named respondent. The information provided indicates that the matter complained of is subject to the statute(s) checked off below:

[ ]   Title VII of the Civil Rights Act of 1964 (Title VII)

[ ]   The Age Discrimination in Employment Act (ADEA)

[ X ]   The Americans with Disabilities Act (ADA)

[ ]   The Equal Pay Act (EPA)

[ ]   The Genetic Information Nondiscrimination Act (GINA)

The attached EEOC Form 5, Charge of Discrimination, is a summary of your claims based on the information you provided. Because the document that you submitted to us constitutes a charge of employment discrimination, we have complied with the law and notified the employer that you filed a charge. Before we investigate your charge, however, you must sign and return the enclosed Form.

To enable proper handling of this action by the Commission you should:

(1) Review the enclosed charge form and make corrections.

(2) Sign and date the charge in the bottom left hand block where I have made an "X". For purposes of meeting the deadline for filing a charge, the date of your original signed document will be retained as the original filling date.

(3) Return the signed charge to this office.

Before we initiate an investigation, we must receive your signed Charge of Discrimination (EEOC Form 5). Please sign and return the charge within thirty (30) days from the date of this letter. Under EEOC procedures, if we do not hear from you within 30 days or receive your signed charge within 30 days, we are authorized to dismiss your charge and issue you a right to sue letter allowing you to pursue the matter in federal court. Please be aware that after we receive your signed Form 5, the EEOC will send a copy of the charge to Texas Workforce Commission Civil Rights Division 101 East 15th St Room 144T Austin, TX 78778 as required by our procedures. If that agency processes the charge, it may require the charge to be signed before a notary public or an agency official. The agency will then investigate and resolve the charge under their statute.

Received

MAR 3 0 2016

GP&A

On the Form 5 please place your address in the appropriate block. The address you provided was that of your attorney, we need your address. Also, please provide the number of employees that are employed with the Respondent (15-100, 101-200, 200-400, 500 and above).

A threshold issue regarding charges filed under the Americans with Disabilities Act of 1990 (ADA) where the date of alleged discrimination occurred on or after January 1, 2009, is to determine if the person filing the charge is disabled as defined by the ADA. To make this determination, an analysis is required to show that you have an impairment that rises to the level of "substantially" limiting one or more of your major life activities.

1. What is the condition that Charging Party (CP) believes was the basis for the employer's alleged discrimination?

2. What did the employer do or say that makes CP think that her condition is the reason for the employer taking the action she thinks is discrimination?

3. How long has CP had this condition? How long is her condition expected to last? If her condition comes and goes, please explain. If her condition is in remission, please explain.

4. Does CP's condition affect a major bodily function, such as her immune system, cell growth, neurological, brain, respiratory, circulatory, endocrine, waste elimination, or reproductive functions? If yes, please explain. (Note: conditions such as epilepsy, insulin-dependent diabetes, kidney disease, cancer, HIV, and Hepatitis C are examples of conditions that affect major bodily functions).

5. Which of the following activities are affected by CP's condition? (Note: the condition does not have to affect more than one major life activity to be a disability but check all that apply.)

| | | |
|---|---|---|
| – walking | – speaking | – learning |
| – standing | – breathing | – thinking |
| – sitting | – lifting | – concentrating |
| – seeing | – reaching | – interacting with others |
| – hearing | – sleeping | – reproduction or sexual relations |
| –eating | – caring for self | – eliminating/controlling bodily waste |
| – bending | – reading | – performing manual tasks |
| – communicating | – working | – other? |

6. Is it harder for CP to do these activities than it is for most people (when her condition is active)? If so,how? Can CP do the activity for less time or to a lesser extent, needs more time, experiences pain or performs the activity in a different manner than most other people.

7. Does CP take any medications, receive any treatment, or use any assistive devices for her condition? If yes, please explain how they affect her? What would happen if CP did not take her medications, receive her treatment, or use her assistive device?

8. How did CP's employer become aware of her condition? Has CP's employer received any records or documents, including doctor's notes, which discuss her condition or any limitations resulting from her condition? If yes:
□□What records were given to CP's employer and when?
□□What did those records say and whom were they from?

9. Does CP's condition interfere with doing one or more jobs or job duties? Is so, how? When and for how long has CP been limited in her ability to do these jobs or job duties?

10. CP states her employer is aware of her condition and that she has taken multiple days off from work due to her disability. How often was CP absent? Did CP request a reasonable accommodation, i.e., time off work? Please explain in detail.

11. The discriminatory statutes prohibit retaliation against individuals because they have opposed any practice made unlawful by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the laws. Did CP make a protected complaint? If so, describe in detail the complaint, when it was made, the name and position title of the individual CP complained to, and whether verbal or written. If written provide a copy.

12. What was CP's job title? Provide the name and position title of the individual who discharged CP. Provide the name, position title, and age of other similarly situated employees (those in a similar position as CP) who were accused of not meeting the budgeted contribution margin that were not discharged, and explain, what action, if any, were taken against them.

13. What is Respondent's disciplinary policy/practice regarding performance issues for employees in CP's position? Provide a written copy if available.

14. What evidence does CP have to show her discharge was due to her disability?

15. Provide CP's race and national origin.

16. Please provide other comparators similarly situated that also did not take calls the number of times that you were alleged and were not terminated.

Although I am currently not the assigned investigator on this case, the requested information is vital for the investigation of this case. Please provide this information by the time frame stated above.

Please use the "EEOC Charge No." listed at the top of this letter whenever you call us about this charge. Please also notify this office of any change in address or of any prolonged absence from home. Failure to cooperate in this matter may lead to dismissal of the charge.

Please also read the enclosed brochure, "What You Should Know Before You File A Charge With EEOC," for answers to frequently asked questions about employee rights and the EEOC process. If you have any questions, please call me at the number listed below. If you have to call long distance, please call collect.

Sincerely,

Roy Roscoe
EEOC, Federal Senior Investigator
(210) 281-7688

Office Hours: Monday – Friday, 8:30 a.m. - 5:00 p.m.
www.eeoc.gov

Enclosure(s)
    Copy of EEOC Form 5, Charge of Discrimination
    Copy of EEOC Uniform Brochure, "What You Should Know Before You File A Charge With EEOC."

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 451-2016-01505 |

| Texas Workforce Commission Civil Rights Division | and EEOC |
|---|---|
| *State or local Agency, if any* | |

| Name *(indicate Mr., Ms., Mrs.)* | Home Phone *(incl. Area Code)* | Date of Birth |
|---|---|---|
| **Ms. Rebecca Poole** | | |

| Street Address | City, State and ZIP Code | |
|---|---|---|
| | (alternate #) | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. *(include Area Code)* |
|---|---|---|
| **AFFILIATES FOR WOMEN'S HEALTH, P.A.** | | |

| Street Address | City, State and ZIP Code | | |
|---|---|---|---|
| **1620 Rock Prairie Road, Ste. 430,  College Station, TX 77845** | | | |

| Name | No. Employees, Members | Phone No. *(include Area Code)* |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code | |
|---|---|---|
| | | |

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

☐ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☒ RETALIATION  ☐ AGE  ☒ DISABILITY  ☐ GENETIC INFORMATION
☐ OTHER *(Specify)*

DATE(S) DISCRIMINATION TOOK PLACE
Earliest **05-21-2015**   Latest **06-08-2015**

☐ CONTINUING ACTION

THE PARTICULARS ARE *(if additional paper is needed, attach extra sheet(s)):*
**See Attached Document for Charge Detail.**

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| 4/26/16<br>*Date*          *Charging Party Signature* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>*(month, day, year)* |



REBECCA POOLE
c/o Glenda Pittman & Associates, P.C.
4807 Spicewood Springs Road
Building 1, Suite 1245
Austin, Texas 78759
gpittman@pittmanfink.com

March 11, 2016

Equal Employment Opportunity Commission          VIA UPS Overnight Delivery
Legacy Oaks, Building A                          Tracking No. 1ZF7V1410191073106
5410 Fredericksburg Road, Suite 200
San Antonio, Texas 78229

Re:    Sworn Charge of Disability Discrimination against Affiliates for Women's Health, P.A.

       Presented for Dual Filing with the Equal Employment Opportunity Commission and the
       Texas Workforce Commission

Dear EEOC and TWC:

       My name is Rebecca Poole. My birth date is October 3, 1981, and I am female.  My
contact information is in the letterhead, above.

       This is a sworn charge of disability discrimination and retaliation against my former
employer, Affiliates for Women's Health, P.A [AWH], a medical practice specializing in
obstetrics and gynecology with 15 or more employees.  Affiliates is located at:

       Affiliates for Women's Health, P.A.
       1602 Rock Prairie Road, Suite 430
       College Station, Texas 77845

The owners and officers of AWH are Drs. Randy Smith, Ben Zivney, and Michelle Garant.
Their office phone number is 979-693-0737.

       I was employed by AWH as an Ob/Gyn physician from October 1, 2014 until June 8,
2015, when my employment was terminated. This was my first job as a physician after
completing my education and training.  I suffer from Post Traumatic Stress Disorder as a result
of a traumatic sexual assault in February 2015. I also suffer from other medical conditions,
including migraine headaches, which are controlled by medication, and from Attention Deficit
Disorder, which is also under control. AWH discriminated against me because of my PTSD and
medical conditions.  Among other things, AWH refused to provide a reasonable accommodation
of my PTSD symptoms, falsely accused me of being impaired by drugs, revealed my personal
medical information without permission, attempted to require me to take a urinalysis without

Charge of Discrimination
Rebecca Poole
March 11, 2016
Page 2

justification, caused me to be temporarily restricted from practicing at the local hospital, and ultimately AWH discharged me on manufactured grounds. The first significant act of discrimination based on my PTSD and other medical conditions occurred on or about May 21, 2015 and continued to the termination of my employment on June 8, 2015. The following is a summary of facts supporting this charge:

Midday on May 21, 2015, I fractured my ankle in an accidental fall at work. Despite the pain caused by the fracture, I completed my duties for the day, including completing discharge duties that evening for a patient at the College Station Medical Center [Hospital], the hospital at which I and the other AWH doctors practiced. The husband of that patient was himself a physician and, noting that I visibly was in great pain and that my ankle was quite swollen, he briefly examined my ankle, concluded that it was broken. He advised me to go to the Hospital's emergency room to have my ankle formally examined and treated. Because I was assigned to take call that evening, I called Dr. Michelle Garant, AWH's Vice President, to discuss assigning a substitute on-call physician. I informed Dr. Garant that I had fallen at work, was in great pain and was in the ER. Dr. Garant agreed to make the necessary arrangements for a substitute on-call physician.

Shortly after talking with me, without my knowledge or consent, Dr. Garant called the Hospital and discussed my condition with both Dr. Hilary Nwosu, the ER physician on duty, and Nicole Williams, the Hospital's House Officer, eliciting or obtaining from them private health information concerning me. During the conversations, Dr. Garant said that she believed that I was on drugs and that the fall had resulted from my being impaired by drug use. Dr. Garant told Dr. Nwosu that he should require me to provide a urine sample by catheterization while I was in the ER. As urged by Dr. Garant, Dr. Nwosu told me that I must provide a urine sample by catheterization. I declined to endure the invasive procedure of being catheterized. I did promptly provide a urine sample in a cup in the presence of Hospital personnel. That sample was never tested.

Dr. Garant's communications that I may be impaired from drug abuse lead to a Hospital peer review body investigating whether I was impaired. Although the Hospital did not formally restrict my Hospital privileges, beginning in the latter part of May, 2015, the Hospital orally informed me that, although my privileges were full and unrestricted, I must refrain from patient care in the Hospital while the peer review process was in progress or my privileges would be summarily suspended. A drug test performed early in the peer review process yielded negative results, and ultimately, in August, 2015, the peer review body determined that I was not impaired and that no limitations on my Hospital privileges would be imposed.

AWH's officers required that I meet with them on May 22, May 26 and June 7, 2015 to discuss my employment. I informed them of the Hospital's position concerning my treatment of patients during the peer review process that had resulted from Dr. Garant's unwarranted allegations about me. However, I told them that I was ready, willing and able to treat patients at the AWH's clinic and to take answering service calls. At the May 26, 2015 meeting, they questioned me at length about my PTSD symptoms, my migraines and my ADD and about the medications I was taking or had taken for these conditions. They told me that they did not trust



me to treat their patients, and that they believed I was impaired. There was no valid basis for this allegation.

I told the officers that I was sometimes exhausted due to difficulty sleeping when my husband was traveling and I was alone all night. This was one of the PTSD symptoms resulting from the sexual assault. I told them that it would help me if my on-call schedule were modified so that I would not be on call on the few nights after my husband was scheduled to be out of town. The AWH officers rejected this accommodation request, accusing me of thinking only of myself and not AWH. At the May 26, 2015 meeting, after accusing me of being impaired, the officers ordered me to return my keys to the clinic and told me I could not treat any patients or access any patient medical records.

I made many requests to have my clinic and medical records access restored, and to be allowed to return to treating patients at the clinic. My requests were denied. Instead, AWH demanded that I continue to treat patients at the Hospital by complying with AWH's previously-prepared on-call schedule. Specifically, AWH ordered me to take call on May 29, 30 and 31, and June 4 and 8, 2015. It was impossible for me to comply with this order. As AWH's officers knew, I was restricted from practicing at the Hospital due to Dr. Garant's unfounded allegations. In addition, I could not safely treat on call patients because AWH had taken away my electronic access to patient medical records. I suggested that one or more of AWH's officers meet together with me and the Hospital CEO and attempt to persuade him to modify the Hospital's position. They declined to do so.

On June 8, 2015, AWH terminated my employment, relying on Section 8.01(4) of the employment contract we had entered into before my employment began. That section provided for termination upon the physician's failure or refusal to perform the duties described in the Agreement. The Practice's termination letter listed as such failures my not taking call on May 29, 30 and 31, and June 4 and 8, 2015, and my declining to exercise my Hospital privileges.

As a result of AWH's actions, I have lost wages, incurred numerous additional job search and other expenses, and the Hospital has claimed that I must repay substantial salary subsidies, student loan payments, and moving expenses it paid on my behalf. I have suffered significant emotional distress and damage to my professional and personal reputations.

The above is a description, to the best of my present knowledge and recollection, of some of the conduct of which I complain, but it is not intended as a description of every instance of objectionable, or otherwise relevant, conduct.

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

_____
Rebecca Poole



EEOC Form 161 (11/16)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

| To: | Rebecca Poole<br>4807 Spicewood Springs Road<br>Building 1, Ste 1245<br>Austin, TX 78759 | From: | San Antonio Field Office<br>5410 Fredericksburg Rd<br>Suite 200<br>San Antonio, TX 78229 |
|---|---|---|---|

☐ *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 451-2016-01505 | Roy Roscoe,<br>EEOC, Federal Senior Investigator | (210) 281-7688 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☒ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☐ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other *(briefly state)*

### - NOTICE OF SUIT RIGHTS -

*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

Enclosures(s)

Travis G. Hicks,
Director

12/20/2016
*(Date Mailed)*

cc:

| Gretchen Agena (Attorney)<br>Littler Mendeson, P.C.<br>1301 McKinney St.<br>Ste. 1900<br>Houston, TX 77010 | Glenda L. Pittman (Attorney)<br>GLENDA PITTMAN & ASSOCIATES, P.C.<br>4807 Spicewood Springs Road<br>Building 1, Ste, 1245<br>Austin, TX 78759 |
|---|---|

# EXHIBIT B

## PHYSICIAN EMPLOYMENT AGREEMENT

*By this Agreement, **AFFILIATES FOR WOMEN'S HEALTH, P.A.** referred to in this Agreement as "the Association", located at 1602 Rock Prairie Road, Suite 430, College Station, TX 77845, employs Rebecca Poole-Ward, M.D., referred to in this Agreement as "the Doctor".*

***AFFILIATES FOR WOMEN'S HEALTH** is an Association organized under the Texas Professional Association Act to conduct the authorized professional services that may be performed by a Doctor of Medicine, duly licensed under the laws of the State of Texas. The activities of the Association are conducted in Brazos County, Texas, and the surrounding areas.*

*Contingent upon the prior execution of a Salary Subsidy Agreement with College Station Medical Center LLC ("Hospital" herein) regarding the Association's employment of the Doctor, the Association and the Doctor agree to establish a professional employment relationship on the following terms, covenants, and conditions:*

### ARTICLE 1

### EMPLOYMENT AND DUTIES
***1.01** The Association employs the Doctor, and the Doctor accepts employment with the Association, as a member of and employee on the staff of the Association, to render medical and surgical services for the Association, as determined by the Board of Directors of the Association in the manner and to the extent permitted by the Texas Professional Association Act and the applicable canons of professional ethics. The Doctor's duties shall include, but not be limited to: the full time practice of obstetrics and gynecology on behalf of the Association and to engage in the medical business of the Association, all as directed by the Association from time to time.*

*The Doctor shall be responsible for:*

*(a)  Keeping and maintaining, or causing to be kept and maintained, appropriate records, reports, claims, and correspondence necessary and appropriate in connection with all professional services rendered by her under this Agreement. All of such records, reports, claims, and correspondence shall belong to the Association.*

*(b)  Promoting, to the extent permitted by law and the applicable canons of professional ethics, the professional practice of the Association.*

*(c)  Attending, to the extent reasonable, professional conventions, postgraduate seminars, and functions of professional societies.*

*(d)  Performing all acts reasonably necessary to maintain and improve her professional skills.*

*The Doctor's other duties shall be as the Association may from time to time reasonably direct, including on duty and on call assignments at night and on Sundays and holidays. Such assignments shall be rotated among the employees of the Association in a reasonable manner. The Doctor may also be responsible for normal duties as an officer of the Association, if elected as such.*

# EXHIBIT 15

## ARTICLE 2

### TERM OF EMPLOYMENT

*2.01 The Association employs the Doctor, and the Doctor accepts employment under this Agreement with the Association, for a period of forty-eight (48) months, beginning on* ___August 1, 2014___ *, and continuing through the last day of the forty-eighth (48ᵗʰ) calendar month thereafter, unless terminated earlier as provided for in Article 8 "Termination" of this Agreement.*

## ARTICLE 3

### COMPENSATION

#### 3.01 Compensation

*As compensation for services rendered to the Association during the term of this Agreement, in whatever capacity rendered, the Doctor will receive compensation as specified in this Article.*

#### 3.02 Basic Salary

*The Doctor shall be paid a salary of $16,666.66 per month for eighteen (18) months less all deductions required by law or as set forth herein. This salary maybe reduced on a per diem basis of $547.95 for any day that the Doctor is unable or unwilling to perform her duties under the terms of this contract. This per diem reduction does not apply to those days which are given to the Doctor as days off pursuant to Article 4.*

#### 3.03 Remaining Term Salary

*At the conclusion of 18 months the compensation shall be 95% of a production based formula (gross receipts minus adjustments minus expenses) and this compensation plan shall continue until such time as the Doctor elects to buy into the equity of the Association or the end of forty-eight (48) whichever is sooner.*

## ARTICLE 4

### FRINGE BENEFITS

#### 4.01 Vacation and Holidays

*During the term of this Agreement, the Doctor shall be entitled to be off for fifteen (15) working days ("days off") for vacation leave, professional meetings, personal days or continuing education, with pay. "Working days" shall mean Mondays through Fridays. The Doctor must take the aforementioned days off of attendance time at times which are convenient to and approved at least thirty (30) days in advance by the Association.*

#### 4.02 Obligations of Association

*The Association shall provide all equipment, supplies, a proper facility or facilities and an adequate staff (as determined by the Association in its sole discretion) to enable the Doctor to perform her duties as an Obstetrician and Gynecologist. Reimbursement for any other expenses of the Doctor not enumerated herein in her capacity of an employee of the Association shall be granted in the sole discretion of the Association as may be determined from time to time upon the request of the Doctor.*

#### 4.03 Medical Dues and Licenses

*The Association shall be responsible for paying up to $1,500 of the costs of the Doctor's licensing requirements or membership in professional societies.*

**4.04 Cellular Telephone**
The Association shall provide a cellular telephone appropriate for the Doctor's business related usage and the costs of same shall be covered by the Association up to a maximum of $100.00 per month.

**4.05 Continuing Education**
Attendance at professional meetings or continuing education will be at the Doctor's sole expense.

**4.06 Health Insurance**
The Association will contribute up to a maximum of $600 monthly toward the Doctor's costs of health insurance through the Association or the Doctor's choice of carrier.

**ARTICLE 5**

**INDEMNITY AND MALPRACTICE INSURANCE**
**5.01** During the term of this Agreement the Association shall maintain on behalf of the Doctor a policy of professional liability insurance in the same amount as maintained for other physician employees of the Association as determined by the sole discretion of the Association. Such professional liability insurance shall insure the Doctor only for her professional activities commencing with her actual date of employment by the Association. If, upon termination of employment for any reason, the Association, in its sole discretion is of the opinion that it is not sufficiently insured for the acts or omissions of the Doctor during the term of this Agreement, the Doctor or the personal representative of the Doctor's estate, shall procure and maintain professional liability insurance naming the Association as an additional insured thereunder, in a minimum amount equal to the amount of professional liability insurance maintained by the Association for the Doctor during the term of this Agreement and the Doctor or personal representative of the Doctor's estate shall provide proof of such coverage upon request by the Association. (Such coverage is called "tail coverage" herein). In the event the Doctor fails to procure and maintain tail coverage as obligated herein, or in the event the Doctor discontinues her practice of medicine and allows any tail coverage or other professional liability insurance to lapse prior to the expiration of her obligation herein, the Association may procure and maintain tail coverage on behalf of the Doctor. The Doctor agrees to fully cooperate with the Association in the procurement and maintenance of tail coverage, and the Doctor shall bear the entire cost of such coverage. In the event the Association pays the premiums for such "tail coverage", the Doctor shall reimburse the Association, on demand, the amount of premiums paid by the Association to obtain such "tail coverage." Any reimbursement of such premiums which goes unpaid upon demand shall bear interest from the date of demand at the maximum rate permitted by applicable law. The Doctor shall hold harmless and indemnify the Association, its successors, assigns and members, against all liabilities, costs, damages, expenses, and attorney's fees resulting from or attributable to any acts or omissions of the Doctor in violation of or outside the course of duties directly contemplated by this Agreement. However, to the extent that any such liabilities, costs, damages, expenses, and attorney's fees are compensated for by insurance purchased by the Association, the Doctor shall not be required to reimburse the Association for such insurance payments. The obligation by the Doctor to provide tail coverage to the Association shall continue for a period of two (2) years after the expiration of the statute of limitations expires on any act or omission of the Doctor during her employment with the Association which might give rise to professional liability or nineteen (19) years from the termination of the Employment Agreement, whichever occurs first.

## ARTICLE 6

### CONDITIONS DURING EMPLOYMENT
#### 6.01    Patient Relations
Employee agrees that in dealing with patients or prospective patients of the Association she will give no assurance, in any form, to patients or prospective patients that she, or any specific employee of the Association, will perform professional services for such a patient. The Doctor and the Association further agree that the patients will be assigned to her pursuant to the policies of the Association, provided however, that such policies shall take into account the patient's preference and the identity of the referring physician, if any, with all other patients being equitably assigned between the various physicians practicing for the Association. However, nothing herein shall be construed to interfere with any Doctor/patient relationship as provided in Section 7 of the Texas Professional Association Act and the parties agree that nothing in this Agreement shall be construed to derogate from the ethics or code of the American Medical Association.

#### 6.02    Case Records and Histories
All case records, case histories, X-ray films, or personal and regular files concerning patients of the Association or patients consulted, interviewed, or treated and cared for by the Doctor shall belong to and remain the property of the Association. However, upon termination of this Agreement, the Doctor shall have the privilege, within ninety (90) days after termination, of reproducing at her own expense, any of such patients' records as may be necessary to continue her treatment of said patient.

#### 6.03    Loyalty
Any and all professional fees generated by the Doctor during the term of this Agreement shall belong to the Association. "Professional fees" shall include, but not be limited to the fees or remuneration generated by the rendition of medical or surgical services by the Doctor (a) in her capacity of an Employee of the Association; (b) in her capacity as a physician; (c) in her capacity as a person rendering the kind of services for which the Doctor's training as a physician or as a technician in a medically related field as a prerequisite to the condition of the services; and to the extent not in conflict with any Salary Subsidy Agreement with the Hospital which also involves the Association and the Doctor (d) advancements provided by the Hospital or any other facility providing inpatient or outpatient medical care. It is specifically understood and agreed upon that the Doctor shall have no right or claim to any portion of the Association's accounts receivable. It is also understood that any salary subsidy payments to Physician from the Hospital under the Salary Subsidy Agreement are specifically NOT included in section (d) of this paragraph, and shall not be included in this paragraph and belong to the Physician and specifically do not belong to the Association.

## ARTICLE 7

### DISABILITY
#### 7.01    General
Should the Doctor become physically or mentally disabled, and if the disability may be reasonably expected to continue for thirty (30) successive calendar days or more, or in fact does continue for such a period, or for a period of 45 non-consecutive days during the term of this agreement, the Doctor's compensation shall be suspended until such time as she has returned to the full time

practice of obstetrics and gynecology with the Association. "Full time practice of obstetrics and gynecology" shall mean the amount of time and attention which is commensurate with and necessary to perform the functions and duties which the Doctor was performing at the inception of this Agreement. In the event of any disagreement between the Doctor and the Association as to whether any disability does in fact exist, then the disagreement will be arbitrated as set forth in this paragraph. Either the Doctor or the Association shall apply in writing to the President of the Brazos - Robertson County Medical Society and request that such person appoint two physicians from among the members of the Society to serve on a panel of three to conduct an examination into the disability questions at issue. The two appointed physicians shall select a third physician who shall be a licensed psychiatrist mutually agreeable to them and these three physicians shall serve as the panel to answer the disability questions at issue. The three physicians may rely solely on written evidence as to the disability or may conduct their own investigation in order to come to a conclusion. The conclusion shall be presented in writing to the Association and the Doctor and such determination shall be conclusive as to both the Association and to the Doctor. The three physicians shall be entitled to reasonable compensation for their services and the expense of such service shall be borne equally by the Association and the Doctor. If the President of the society shall fail to appoint two physicians within fourteen (14) days of being requested to do so, then the Doctor shall select a physician and the Association shall select a physician and the two physicians shall select a licensed psychiatrist mutually agreeable to them. These three physicians shall answer the questions of disability at issue instead of the medical society appointments contemplated herein.

## 7.02 "Disability" defined

"Disability" for purposes of this Agreement means thirty (30) consecutive calendar days during the term of this Agreement or a total of forty-five (45) non-consecutive calendar days, during which the Doctor is physically or mentally unable to undertake the full time practice of obstetrics and gynecology as required by this Agreement and the Association of its physician employees.

## ARTICLE 8

## TERMINATION

### 8.01 Conditions for Termination

This agreement may be terminated upon the occurrence of any of the following events:

1.  Whenever the Doctor shall cease to be a "licensed person," as defined in the Texas Professional Association Act.

2.  Whenever the Association and the Doctor shall mutually agree to the termination in writing.

3.  The death of the Doctor.

4.  Whenever the Doctor fails or refuses to perform faithfully and diligently the duties of employment and comply with the provisions of this Agreement.

5.  Whenever the Doctor fails or refuses to comply with the reasonable policies, standards, and regulations of the Association as determined in the sole discretion of the Association, said discretion to be reasonably exercised.

6.    The Doctor shall resign from:

   (a)    the medical staff of any hospital in which she has medical staff privileges in
          Brazos County, Texas, or

   (b)    any professional or scientific organization under the threat of disciplinary
          action;

7.    The Doctor shall be accused by a charging instrument before any court of
      competent jurisdiction of any offense involving moral turpitude or punishable as a
      felony or the Doctor files a petition for bankruptcy;

8.    The Doctor shall be expelled, suspended or otherwise disciplined by the final acts
      of any hospital or any professional or scientific organization

9.    The Doctor's privileges in the field of obstetrics or gynecology are limited, reduced
      or suspended by any hospital in which she holds medical staff privileges;

10.   The Doctor, in the opinion of the Association, engages in personal misconduct or
      breach of this agreement of such a serious nature as to render the Doctor's
      continued employment personally or professionally obnoxious or detrimental to the
      Association and such personal misconduct is not ceased and/or such breach is not
      cured within fourteen (14) days of the Doctor's receipt of written notice of such
      personal misconduct and/or breach; provided, however, that the Doctor shall not be
      entitled to any reasonable time to cease or cure any such personal misconduct or
      breach, if the same is, in the opinion of the Association, of such a serious nature
      that continued employment of the Doctor would adversely effect the Association's
      business or is incapable of being ceased and/or cured within a reasonable time.

11.   The termination of the Salary Subsidy Agreement between herself, the Association
      and the Hospital.

### 8.02   Compensation Payable on Termination
Upon termination of this Agreement under any provision of Paragraph 4.01, the Doctor shall be
entitled to receive only the compensation accrued but unpaid as of the date of termination and shall
not be entitled to additional compensation except as expressly provided in this Agreement.

### 8.03   Indemnity by Doctor
The Doctor acknowledges that it is anticipated that a salary subsidy recruitment agreement will
be executed between herself, the Association and the Hospital ("Salary Subsidy Agreement") .
During the duration of the Salary Subsidy Agreement, to the extent that Physician breaches the
terms of the Salary Subsidy Agreement and Association is not at fault and has not breached any
of the terms of the Salary Subsidy Agreement and has fulfilled all of Association's obligations and
responsibilities set forth in the Salary Subsidy Agreement, then Association may seek to hold
Physician responsible for any potential claims against it related to or arising from the Salary
Subsidy Agreement and indemnify the Association for any claims against it related to or arising
from the Salary Subsidy Agreement. In the event of termination of this Employment Agreement for
any reason, during the term (including the duration of the Practice Commitment Period) of the

Salary Subsidy Agreement, the Doctor expressly agrees to continue fulfill all terms applicable to Physician as set forth in the Salary Subsidy Agreement. The Doctor expressly agrees that this shall include her agreement to be responsible for any payments or reimbursements to the Hospital which may be claimed for any amounts paid or advanced to her or on her behalf by the Hospital as described herein and as set forth in the Salary Subsidy Agreement. To the extent that Association is not at fault and has not breached any of the terms of the Salary Subsidy Agreement and has fulfilled all of Association's obligations and responsibilities set forth in the Salary Subsidy Agreement, the Doctor agrees that she will indemnify and hold harmless the Association for all claims, demands, liabilities, damages and expenses (including attorney fees), regardless of when such claims may be made, or whether this Employment Agreement is still in effect, which are related to or arise from the Salary Subsidy Agreement. To the extent not in conflict with any of the terms of the Salary Subsidy Agreement, these obligations for indemnity by Doctor set forth herein include, but are not limited to, claims related to the Salary Subsidy Agreement with the Hospital and the Physicians Community Practice Commitment period defined therein.

## ARTICLE 9

### GENERAL PROVISIONS

#### 9.01    Waiver of Breach or Violation Not Deemed Continuing
The waiver by either party of a breach or violation of any provision of this Agreement shall not operate as or be construed to be a waiver of any subsequent breach of any provision of this Agreement.

#### 9.02    Notices
All notices required or permitted to be given under this Agreement, including a notice of a claim of arbitrable controversy, will be sufficient if furnished in writing, sent by registered mail to the Doctor at _____ and to the Association at its principal office at 1602 Rock Prairie Road, Suite 430, College Station, TX 77845.

#### 9.03    Governing Laws
This Agreement shall be interpreted, construed, and governed according to the laws of the State of Texas. Venue is limited to Brazos County, Texas.

#### 9.04    Paragraph Headings
The paragraph headings contained in this Agreement are for convenience only and shall in no manner be construed as a part of this Agreement.

#### 9.05    Legal Construction and Dispute Resolution by Arbitration
In case any one or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision, and this Agreement shall be construed as if such invalid, illegal, or unenforceable provision had never been included in the Agreement. Except for the decision on disability set out in Paragraph 7.01 above, the Doctor and the Association expressly agree that any other dispute, claim or controversy arising out of or relating to this Agreement, the employment of the Doctor by the Association or the relationships between the Doctor and any member of the Association or its employees shall be submitted to arbitration pursuant to the **Texas Arbitration Act**. If the designation of an arbitrator and rules of arbitration are not agreed between the parties within fourteen (14) days of a notice of arbitrable controversy being delivered pursuant to Section 9.02 above then the decision on an arbitrator shall be submitted to a District Judge of Brazos County, Texas, for the appointment of an arbitrator or arbitrators who will determine the rules of the arbitration.

**9.06   Prior Agreements Superseded**
This Agreement constitutes the sole agreement of the parties with respect to employment of the Doctor by the Association and supersedes any prior understandings or written or oral agreements between the parties respecting that subject matter. This Agreement incorporates completely all of the compensation, inducements and benefits offered by the Association and there are no other representations or inducements in addition to those stated in this Agreement.

The parties named below execute this on behalf of themselves and with the specific intent to bind their successors, assigns and heirs.

Executed at ____0800____, Texas, on ____7/11____, 2013.

**"AFFILIATES FOR WOMEN'S HEALTH"**                    **"DOCTOR"**

By: _____ [signature]                    _____ [signature]

_____                    Rebecca Poole-Ward, M.D.
[typed name and title or designation of person signing
in representative capacity for Association]