**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| REBECCA POOLE-WARD, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-17-885 |
| | § | |
| AFFILIATES FOR WOMEN'S | § | |
| HEALTH, P.A., | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND OPINION**

The plaintiff, Dr. Rebecca Poole-Ward, worked as an obstetrician and gynecologist for Affiliates for Women's Health, a medical practice in College Station, Texas. She alleges that Affiliates denied her reasonable accommodations for her disabilities and terminated her because of discrimination based on her disabilities. Dr. Poole asserted four claims: (1) discrimination under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*; (2) retaliation under the Act; (3) failure to provide reasonable accommodations for her disabilities; and (4) breach of contract. (Docket Entry No. 1).

Dr. Poole alleged that she has attention-deficit hyperactivity disorder ("ADD"), migraines, and posttraumatic stress disorder ("PTSD") due to an assault. She alleged that her disabilities have substantially impaired her capacity to work, sleep, care for herself, and interact with others. She has experienced headaches, weight loss, difficulty sleeping, emotional anxiety, paranoia, flashbacks, and fear in certain circumstances. Dr. Poole alleged that she asked Affiliates for several accommodations, some of which were granted, some denied. According to Dr. Poole, Affiliates ridiculed and questioned her accommodation requests and did not explain, document, or engage in

1

interactive dialogue when it denied them. She alleged that her termination for failing to perform her duties was a pretext for disability discrimination.

After the parties completed discovery, Affiliates moved for summary judgment on Dr. Poole's breach-of-contract claim and her claims for discrimination and retaliation under the Americans with Disabilities Act. (Docket Entry No. 36). Dr. Poole has responded, arguing that there are factual disputes material to deciding those claims. (Docket Entry No. 37). Affiliates did not move for summary judgment on Dr. Poole's failure-to-accommodate claim.

Based on a careful review of the pleadings, the motion and response, the summary judgment record, and the applicable law, Affiliates's motion for partial summary judgment, (Docket Entry No. 36), is denied. The breach-of-contract claim and the Americans with Disabilities Act discrimination and retaliation claims, as well as the failure-to-accommodate claim, may go forward.

The reasons for these rulings are explained below.

## I.     Background

Affiliates for Women's Health is a medical practice specializing in obstetrics and gynecology in College Station, Texas. The Affiliates clinic is connected to the College Station Medical Center, which is referred to in this opinion as "the Hospital." Affiliates doctors treat their own patients at the Hospital and also work "on-call" hours there, treating the patients of other Affiliates doctors. When Dr. Poole worked for Affiliates, she was one of four doctors, Drs. Michele Garant, Randy Smith, and Ben Zivney. Dr. Poole was the only non-partner physician at Affiliates.

Dr. Poole's employment agreement required her to perform "other duties . . . reasonably direct[ed]" by Affiliates, including on-duty and on-call assignments at night, on Sundays, and on holidays. (Docket Entry No. 36, Ex. 3 § 1.1). Those "other" duties "rotated among employees of

the Association in a reasonable manner." (*Id.*).  The employment agreement also required Dr. Poole to be a "licenced person," as defined in the Texas Professional Association Act.  (*Id.* § 8.01).  The agreement stated that Dr. Poole could be terminated for failing "to perform faithfully and diligently the duties of employment"; to comply with the reasonable policies of Affiliates; or if her "privileges in the field of obstetrics and gynecology [were] limited, reduced or suspended by any hospital in which she holds medical staff privileges."  (*Id.*).

Affiliates points to testimony that Dr. Poole had difficulty completing electronic medical records, reconciling lab test results in a timely fashion, and that in February 2015, a complaint was filed about Dr. Poole's treatment of a patient.  (*Id.* Exs. 4, 5, 6).  Affiliates worked with Dr. Poole to improve her performance.

On February 21, 2015, Dr. Poole was drugged and sexually assaulted.  The next day, she attended a women's college basketball game, a public-relations event for the Hospital, with Dr. Garant, an Affiliates physician and partner.  At the game, Dr. Poole told Dr. Garant that she had been assaulted.  Dr. Garant recommended that Dr. Poole seek medical treatment.  Dr. Garant contacted several hospitals to treat Dr. Poole, but she did not know whether or from whom Dr. Poole sought treatment.

After the assault, Dr. Poole was diagnosed with, and prescribed medication for, PTSD.  When Dr. Poole returned to work, she disclosed the details of the assault to Affiliates staff members, including an insurance biller, Sarah Mendez, and a nurse, Betty Brown.

Dr. Poole asked Affiliates for several accommodations for the PTSD, ADD, and migraines she alleges she suffered after the assault.  The requests included that: (1) Affiliates allow her enough time off to rest or recuperate from her migraine episodes, to take medication for her disabilities, and

to go to doctor's appointments; (2) Dr. Zivney not wear a wristwatch that looked similar to the one Dr. Poole's assailant had worn; (3) Affiliates employees, particularly Dr. Zivney, not discuss the details of Dr. Poole's assault; (4) Affiliates reduce the hours she was on call in the evenings for emergencies; and (5) Affiliates allow her to switch on-call coverage whenever she experienced a PTSD event that resulted in the loss of sleep.

On February 26, 2015, Dr. Garant and Dr. Zivney met with Dr. Poole to express concerns about Dr. Poole discussing the details of her assault with other Affiliates employees while at work; about Dr. Poole's requests to staff members to provide written statements in response to the complaint about patient care that had been filed against her; and about her performance while making rounds at the Hospital. The doctors reminded Dr. Poole "in the strongest possible terms that she is expected to make rounds on all patients in a timely manner." (*Id.* Ex. 9). During this meeting, Dr. Poole observed Dr. Zivney's wristwatch, which was similar to one worn by her attacker. She told Dr. Zivney and Dr. Garant additional details about the assault and asked Dr. Zivney not to wear that watch. At this meeting, Dr. Poole did not tell Dr. Zivney and Dr. Garant that she had been diagnosed with PTSD, but she asked them not to mention the assault.

Dr. Poole points to evidence that Affiliates did not provide her all the accommodations she requested. In her declaration, Dr. Poole states that Dr. Zivney "cornered" her in the break room and questioned her about the sexual assault "over 10 times," after she had asked him and the other doctors not to discuss the incident. (Docket Entry No. 37, Ex. 2). Dr. Poole states that she was so upset that she closed her door, wept, and was delayed seeing patients. Dr. Poole also states that after she asked Dr. Zivney not to wear the wristwatch, Dr. Zivney wore that watch exclusively, even though he owned several others. He wore the offending watch to his deposition in this lawsuit. Dr.

Poole states that Dr. Smith denied her requests to take time off to go to a rape-crisis counselor and weekly therapy appointments. As to her ADD, Dr. Poole states that, after disclosing to Dr. Zivney that she had ADD and asking him not to talk to her about non-work-related subjects, he continued to address non-work-related subjects and interrupt her during the workday. At one point, according to Dr. Poole, Dr. Zivney "suggest[ed] that [she] was not a skilled professional if [she] could not deal with interruptions." (*Id.*). Finally, Dr. Poole states that Dr. Garant denied several of her requests to switch on-call hours when she was not sleeping and seeking treatment for her PTSD.

The parties dispute whether and when Dr. Zivney and Dr. Garant learned about Dr. Poole's PTSD diagnosis. Dr. Poole points to her declaration in which she stated that after a therapy session, she told Dr. Garant that "my therapist told me I have PTSD" and mentioned symptoms, including "flashbacks . . . nightmares and lack of sleep." (Docket Entry No. 37, Ex. 2). Dr. Garant testified that she did not learn of the diagnosis until a May 26, 2015 meeting. (*Id.* Ex. 5 at 55). Dr. Poole stated that, after Dr. Zivney asked her for specific details about the assault, she told him that she was "seeing a therapist, and . . . had been diagnosed with PTSD." (*Id.*). In contrast, Dr. Zivney testified that he "never knew that Dr. Poole had PTSD . . . until this lawsuit was filed." (Docket Entry No. 36, Ex. 7 at 30).

At the May 26 meeting, at which Drs. Garant, Zivney, and Smith were present, Dr. Poole stated:

> Dr. Garant: So Rebecca, would it be fair to say that you were possibly impaired on Thursday, because you're suffering from lack of sleep and a short-term mental illness because of stress that you've been through, and perhaps it isn't necessarily drug induced, but perhaps it's more induced by what you've had to go through and (Inaudible.)
>
> Dr. Poole: I could agree with that. *I think there's PTSD* or –

Dr. Garant: My – my – my concern is that – is that – is that I think you were impaired on Thursday, and I don't know why, but I think everybody around you noticed and you didn't notice.

(*Id.* Ex. 15 at 100) (emphasis added).

On May 21, 2015, Dr. Poole was scheduled to take call to see patients at the Hospital. Dr. Poole's husband, who was part of Dr. Poole's emotional-support plan for her PTSD symptoms, was out of town for the first time since the sexual assault. The night before, Dr. Poole was not able to sleep due to her PTSD. She called Dr. Garant to ask her to switch on-call shifts, but Dr. Garant refused.

Affiliates points to testimony that on May 21, Dr. Poole was behaving unusually and showing signs of impairment. The same day, Dr. Poole fell out of her chair at her desk and broke a bone in her foot. She went to the Hospital emergency room after her shift to get her foot treated. Dr. Garant covered for Dr. Poole's on-call duty at the Hospital while Dr. Poole was in the emergency room. Dr. Garant called the emergency-room doctor to express a "concern that [Dr. Poole] may be using a lot of narcotics and recommended [a urine drug screen]. [Dr. Garant was] worried that the fall could be due to patient using too many narcotic medications." (Docket Entry No. 37, Ex. 24 at 4). Dr. Poole left the emergency room at 2:40 a.m. on May 22, 2015, after complying with the Hospital's request for a urine sample.

Dr. Poole disputes that she was impaired or acting unusually on May 21. She cites declarations of some of the patients she treated that day stating that her treatment of them had been safe and professional. She also cites the testimony of nurses Nicole Williams and Sherri Steele stating that they did not see any unusual or impaired behavior.

Dr. Poole had several meetings about her conduct on May 21: four with Drs. Garant, Zivney, and Smith on May 22, May 26, June 7, and June 8; two with Larry Rodgers, the CEO of the Hospital, and Dr. Rajesh Harrykissoon, the Hospital's chief of staff, on May 26 and 27; and a meeting with the Hospital's ad hoc committee on June 5. Dr. Poole used her cell phone to surreptitiously record the meetings with Drs. Garant, Zivney, and Smith, and to record one of the meetings with Dr. Harrykissoon. Transcriptions of the recordings are in the record. (Docket Entry No. 37, Exs. 17–22; No. 36, Exs. 13, 15, 31).

On the afternoon of May 22, Drs. Garant, Zivney, and Smith met with Dr. Poole about her behavior the day before. Dr. Poole recorded this meeting. Dr. Smith asked Dr. Poole if she had taken any prescribed medications affecting her judgment, ability to treat patients, or alertness. Dr. Poole disclosed that she took Adderall for ADD and that she had been taking sleeping pills since the assault. Dr. Poole states that the questioning about her medications went on for hours, and the transcript shows that one of the doctors stated "I'm having a hard time following what you're saying. I'm having a hard time believing what you're saying." (Docket Entry No. 37, Ex. 17 at 17).

On May 26, after meeting with CEO Rodgers and Dr. Harrykissoon, Dr. Poole met again with Drs. Garant, Zivney, and Smith. Dr. Poole recorded this meeting. The doctors again asked Dr. Pool about her prescription medications and medication use. Dr. Poole stated that she had PTSD as a result of the February assault. (*Id.* Ex. 19 at 100). At the meeting, Dr. Garant expressed concerns about Dr. Poole being addicted to drugs. "I've had enough experience with addiction . . . in friends and family to know that I – I'm not going to pretend from the standpoint of patient care. . . . [A]s chief of OB, if there's a reasonable suspicion that [CEO Rodgers and Dr. Harrykissoon are] telling me from various people and they won't be specific, then I . . . can't believe anything else until

you prove it to me otherwise." (*Id.* at 129). After Dr. Garant spoke, Dr. Smith asked Dr. Poole to turn over her keys to her office "until we know where we're going with this." (*Id.* at 130).

Dr. Poole met with CEO Rodgers and Dr. Harrykissoon on May 27, again recording the meeting. Dr. Harrykissoon stated that whether Dr. Poole could continue to practice would be decided between her and the Affiliates doctors. He told her that "taking the week would be reasonable. . . . I bet within this week we probably will have further guidance like, you know, do you come back shorter than the week or do we need to consider a longer duration, but I think, you know, kind of a voluntary leave." (*Id.* Ex. 20).

On June 1, the Hospital's medical-executive committee met to consider the allegations against Dr. Poole related to her conduct on May 21. On June 2, CEO Rodgers informed Dr. Smith that Dr. Poole "is currently on a voluntary leave of absence from the Medical Staff" and that the "Medical Staff Bylaws state that a physician on a leave of absence shall not be permitted to provide any patient care services in the Hospital or provide any call coverage." (Docket Entry No. 36, Ex. 17).

On June 3, Dr. Poole received the final urine drug screen. It showed negative results. The same day, Dr. Poole's counsel delivered a letter to Dr. Smith with the negative drug-screen results.

On June 4, after receiving the results of the drug screen and speaking with Dr. Poole's counsel, CEO Rodgers sent a letter and email to Dr. Poole stating:

> Per the request of your legal counsel, the purpose of this letter is to confirm the current status of your clinical privileges and Medical Staff membership at College Station Medical Center (the 'Hospital'). Please be advised that you currently maintain unrestricted clinical privileges and Medical Staff membership at the Hospital. In addition, you recently clarified that it was not your intent to request a formal leave of absence from the Medical Staff.

> Accordingly, you are not currently subject to any restrictions with respect to your clinical privileges and Medical Staff membership.

(Docket Entry No. 36, Ex. 19). Doctor Poole emailed the letter to Dr. Smith at 6:57 p.m. on June 4. On June 5, Dr. Poole met with the Hospital's ad hoc committee. She presented the negative drug-screen results to the committee, and then she waited for its decision.

Based on the June 4 letter from CEO Rodgers to Dr. Poole, the other Affiliates doctors expected Dr. Poole to fulfill her on-call hours for June 8. The doctors sent Dr. Poole several text messages asking to confirm that she would perform her on-call duties. She responded that she could not do so. Instead, she would "not exercise my hospital privileges until after the Ad Hoc committee comes back with their decision at their request." (Docket Entry No. 36, Exs. 25–30). Dr. Smith responded to her message to the group:

> Rebecca,
> You have on-call duties and responsibilities on Monday June 8, 2015. Michele will be out of the office all next week. Ben already took call for you Thursday June 4th when you could not fulfill your on-call duties. There have been no changes to the call schedule for June. The June call schedule was provided to you in April. Will you be able to fulfill your on-call duties at the hospital on Monday June 8, 2015. Randy

(*Id.*).

The parties dispute whether Dr. Poole was allowed to fulfill on-call duties between June 2 and June 7. The record evidence is conflicting. Dr. Poole points to evidence that she had an agreement with the ad hoc committee that, despite the letter from the Hospital's CEO stating that she had "unrestricted clinical privileges and Medical Staff membership," she could not see patients at the Hospital until the ad hoc committee had resolved her case. In a transcript of a meeting with Drs. Poole, Zivney, and Smith, Dr. Poole states that, despite the letter from CEO Rodgers, "the hospital's attorney, through verbal communication with mine, stated that my privileges would be

suspended if I stepped in the hospital to treat a patient before the ad hoc committee had time to meet and fulfill their recommendations." (Docket Entry No. 37, Ex. 22 at 5). She asked Affiliates to allow her to see patients only in the Affiliates clinic and not in the Hospital.

On June 7, Dr. Poole met with Dr. Zivney and Dr. Smith. Dr. Poole recorded this meeting. Dr. Smith asked her whether she would be able to fulfill her on-call duties for June 8. Dr. Poole said she could not but that she would let them know later that evening, by 9:00 p.m. At 9:48 p.m. on June 7, Dr. Poole re-confirmed by email that she would not fulfill her on-call duties for June 8. She stated: "I maintain that I can not exercise my privileges at [the Hospital], while I await the ad hoc committee's decision, or get clarification from the CEO/attorney of the hospital system." (Docket Entry No. 36, Ex. 32). Instead of fulfilling her on-call hours at the Hospital, she offered to "return to seeing patients in the clinic." (*Id.*).

On June 8, Dr. Smith and Dr. Zivney met with Dr. Poole and terminated her employment. A June 8, 2015 termination letter signed by Dr. Smith stated the following reasons:

> Cause for termination includes 8.01(4). "Whenever the Doctor fails or refuses to perform faithfully and diligently the duties of employment and comply with the provisions of this agreement"
>
> . . .
>
> Included in your failure or refusal to perform faithfully and diligently the duties of employment are:
>
> (1) Your failure to take assigned calls on May 29, 2015, May 30, 2015, and May 31, 2015. The inability to provide the requested letter regarding your medical staff status at College Station Medical Center resulted in Dr. Garant covering your on-call assignment. Your call assignment was made in March 2015.
>
> (2) Your refusal to take assigned call on June 4, 2015. Your counsel's letter dated June 3, 2015 insisted that you be able to return to your clinical practice "no later than 9:00am Thursday June 4 2015" and we received the requested letter regarding your medical staff status at College Station Medical Center. Your call assignment for

June 4, 2015 was made in April 2015.  Your email to Dr. Smith June 4, 2015 shows a refusal to take your assigned call.  As a result, Dr. Zivney covered your responsibilities.

(3) Your inability to perform assigned duties.  The text message to Dr. Smith on 6/5/2015 states that you will "not exercise your hospital privileges."  You are unable to perform the duties directed by the association by not exercising your hospital privileges.

(4) Your email June 7, 2015 confirming that you will not exercise your clinical privileges at CSMC.

(5) Your refusal to take assigned call on June 8, 2015.  Your call assignment for June 8, 2015 was made in April 2015.

(Docket Entry No. 36, Ex. 33).

On August 27, more than a month after Affiliates terminated Dr. Poole's employment, the ad hoc committee concluded that she did not "currently suffer from an impairment or other wellness issue that would affect her ability to practice."  (Docket Entry No. 37, Ex. 14).  The committee elected "to close the wellness investigation effective immediately."  (*Id.*).

II.    **The Summary Judgment Record**

The summary judgment record consists of the following materials:

•    Dr. Poole's declaration, (Docket Entry No. 37, Ex. 2);

•    excerpts from Dr. Poole's deposition testimony, (Docket Entry No. 37, Ex. 3); (Docket Entry No. 36, Ex. 2)

•    Dr. Poole's employment agreement, (Docket Entry No. 36, Ex. 3);

•    deposition testimony of Drs. Michele Garant, Randy Smith, and Ben Zivney, the other doctors at Affiliates, (Docket Entry No. 37,  Exs. 4–6); (Docket Entry No. 36, Exs. 4, 5, 7);

•    Dr. Garant's declaration, (Docket Entry No. 36, Ex. 1);

- deposition testimony of America Farrell, the current CEO of College Station Medical Center, and Dr. Rajesh Harrykissoon, the chief of staff, (Docket Entry No. 37, Exs. 7, 8); (Docket Entry No. 36, Exs. 35, 36)

- deposition testimony of nurses Nicole Williams, Sherri Steele, Debbie Daniel, and Robin Gooch, and Sarah Mendez, Affiliates's insurance biller, (Docket Entry No. 37, Exs. 9–13); (Docket Entry No. 36, Exs. 8, 11, 12);

- documentation from the Hospital's ad hoc committee, (Docket Entry No. 37, Ex. 14);

- declarations of Dr. William Loesch and Hayley Leonard, (Docket Entry No. 37, Exs. 15, 16);

- transcriptions of audio recordings of meetings between Dr. Poole, Dr. Garant, Dr. Smith, and Dr. Zivney, (Docket Entry No. 37, Exs. 17–22); (Docket Entry No. 36, Exs. 13, 15, 31);

- a complaint about Dr. Poole dated February 16, 2015, (Docket Entry No. 36, Ex. 6);

- results of a drug test, (Docket Entry No. 37, Ex. 23);

- the on-call schedule for May and June 2015, (Docket Entry No. 36, Exs. 10, 24);

- a March 2, 2015 email from Dr. Zivney to Drs. Smith and Garant, and Susie Schuleman, Affiliates's office manager, (Docket Entry No. 36, Ex. 9);

- a May 23, 2015 email from Charles Hall, the assistant chief nursing officer of the Hospital, to Larry Rodgers, the then-CEO of the Hospital, (Docket Entry No. 36, Ex. 14);

- a May 27, 2015 letter from Dr. Smith to Dr. Poole, (Docket Entry No. 36, Ex. 16);

- a June 2, 2015 letter from Rodgers to Dr. Smith, (Docket Entry No. 36, Ex. 17);

- a June 3, 2015 letter from Dr. Poole's counsel to Dr. Smith, (Docket Entry No. 36, Ex. 18);

- a June 4, 2015 letter from Rodgers to Dr. Poole, (Docket Entry No. 36, Ex. 19);

- emergency-room records, (Docket Entry No. 37, Exs. 24, 25);

- several text messages between Drs. Smith, Garant, and Poole, (Docket Entry No. 36, Exs. 20–22, 25–30).

- a June 4, 2015 email from Dr. Poole to Dr. Smith, (Docket Entry No. 36, Ex. 23);

- a June 4, 2015 letter from the Hospital's counsel to Dr. Poole's counsel, (Docket Entry No. 36, Ex. 37);

- a June 7, 2015 email from Dr. Poole to Dr. Smith, (Docket Entry No. 36, Ex. 32); and

- the June 8, 2015 letter terminating Dr. Poole, (Docket Entry No. 36, Ex. 33).

## III.    The Legal Standard

"Summary judgment is appropriate only if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Vann v. City of Southaven, Miss.*, 884 F.3d 307, 309 (5th Cir. 2018) (citations omitted); *see also* FED. R. CIV. P. 56(a).  "A genuine dispute of material fact exists when the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Burrell v. Prudential Ins. Co. of Am.*, 820 F.3d 132, 136 (5th Cir. 2016) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)).  "The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact.'"  *Brandon v. Sage Corp.*, 808 F.3d 266, 269–70 (5th Cir. 2015) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

"Where the non-movant bears the burden of proof at trial, 'the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating...that there is an issue of material fact warranting trial.'"  *Kim v. Hospira, Inc.*, 709 F. App'x 287, 288 (5th Cir. 2018) (quoting *Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015)).  While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case.  *Austin v.*

*Kroger Tex., L.P.*, 864 F.3d 326, 335 (5th Cir. 2017) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1076 n.16 (5th Cir. 1994)). A fact is material if "its resolution could affect the outcome of the actions." *Aly v. City of Lake Jackson*, 605 F. App'x 260, 262 (5th Cir. 2015) (citing *Burrell v. Dr. Pepper/Seven UP Bottling Grp., Inc.*, 482 F.3d 408, 411 (5th Cir. 2007)). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *Pioneer Exploration, LLC v. Steadfast Ins. Co.*, 767 F.3d 503 (5th Cir. 2014).

"When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings." *Bailey v. E. Baton Rouge Par. Prison*, 663 F. App'x 328, 331 (5th Cir. 2016) (quoting *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010)). The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Jurach v. Safety Vision*, LLC, 642 F. App'x 313, 317 (5th Cir. 2016) (quoting *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005)). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Darden v. City of Fort Worth*, 866 F.3d 698, 702 (5th Cir. 2017).

III.    **Analysis**

A.      **The Disability-Discrimination Claim**

The elements of a *prima facie* showing of disability discrimination under the Americans with Disabilities Act are that the plaintiff: (1) had a disability; (2) was qualified for the job; and (3) "was

subject to an adverse employment decision on account of her disability." *Jurach v. Safety Vision, LLC*, 642 F. App'x 313, 320 (5th Cir. 2016) (citing *Cannon v. Jacobs Field Servs. N. Am., Inc.*, 813 F.3d 586, 590 (5th Cir. 2016); *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 697 (5th Cir. 2014)).  If a plaintiff makes a *prima facie* showing, "the burden of production shifts to the defendant to articulate a 'legitimate, nondiscriminatory reason' for the adverse employment decision, whereby the presumption of discrimination disappears." *Id.* (quoting *Culwell v. City of Fort Worth*, 468 F.3d 868, 873 (5th Cir. 2006)).  "The burden of persuasion then returns to the plaintiff to identify or offer evidence creating a factual dispute 'either (1) that the defendant's reason is not true, but is instead a pretext for discrimination; or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic ('mixed-motives alternative')." *Id.* (quoting *Michael v. City of Dallas*, 314 S.W.3d 687, 691 (Tex. App.—Dallas 2010, no pet.)).

Affiliates moved for summary judgment that Dr. Poole is not a "qualified individual" under the Act and that she has not shown that its reasons for terminating her were a pretext for disability discrimination.

### 1.    Whether Dr. Poole Was a "Qualified Individual"

Affiliates challenges only the second prong of Dr. Poole's *prima facie* case—that she was a qualified individual under the Act.  The term "means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position . . . ." 42 U.S.C. § 12111(8).  "[C]onsideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description . . . this description shall be considered evidence of the essential functions of the job." *Id.*

Affiliates argues that Dr. Poole was not a qualified individual because she could not fulfill her assigned on-call duties and therefore could not perform the essential functions of her job. (Docket Entry No. 36 at 22). Affiliates points to the provisions in the employment agreement requiring Dr. Poole to perform the "full time practice of obstetrics and gynecology on behalf of the Association," and stating that Dr. Poole's "other duties shall be as the Association may from time to time reasonably direct, including on duty and on call assignments at night and on Sundays and holidays." (Docket Entry No. 36, Ex. 3).

Dr. Poole does not dispute that fulfilling on-call duties was an essential function of the job. She argues that she could have performed those essential functions if Affiliates had provided a reasonable accommodation. Dr. Poole cites evidence that she asked for, and Affiliates denied, the accommodation of temporarily rearranging her on-call schedule pending the results of the ad hoc committee's review. Dr. Poole also points to evidence showing that she asked to see patients in the clinic, rather than at the Hospital, to avoid jeopardizing her Hospital privileges. Affiliates denied this request. Finally, Dr. Poole points out that her inability to perform the on-call duties was caused by Dr. Garant's May 21 call to the emergency room when Dr. Poole broke her foot. Dr. Garant expressed a "concern that [Dr. Poole] may be using a lot of narcotics and recommended [a urine drug screen]. [Dr. Garant was] worried that the fall could be due to patient using too many narcotic medications." (Docket Entry No. 37, Ex. 24 at 4). This call triggered the ad hoc committee's review of Dr. Poole's Hospital staff privileges, a review that ended with the committee finding no basis to revoke them.

Dr. Poole has made a *prima facie* showing that she was a qualified individual "who, with or without reasonable accommodation," could perform the essential functions of the job. 42 U.S.C.

§ 12111(8). Dr. Poole has presented evidence that she requested reasonable accommodations to enable her to perform the essential functions of the job; that she was "fully ready to assume clinical duties," including to "take and answer all answering service calls." (Docket Entry No. 37, Ex. 22). Allowing Dr. Poole to see patients only in the clinic or at a different hospital; granting her request for a temporary adjustment of the on-call schedule pending the ad hoc committee's review; or allowing her to take a temporary leave of absence, would have been reasonable accommodations. 42 U.S.C. § 12111(9) (a reasonable accommodation may include "job restructuring, part-time or modified work schedules"); *see also Feist v. La. Dep't of Justice, Office of the Att'y Gen.*, 730 F.3d 450, 453 (5th Cir. 2013) ("[A] modification that enables an individual to perform the essential functions of a position is . . . one of three categories of reasonable accommodation.").

The burden of production shifted to Affiliates articulate a legitimate, nondiscriminatory reason for terminating Dr. Poole. Affiliates met this burden. Its June 8, 2015 termination letter set out the reasons for terminating Dr. Poole:

> Cause for termination includes 8.01(4). "Whenever the Doctor fails or refuses to perform faithfully and diligently the duties of employment and comply with the provisions of this agreement"
>
> . . .
>
> Included in your failure or refusal to perform faithfully and diligently the duties of employment are:
>
> (1) Your failure to take assigned calls on May 29, 2015, May 30, 2015, and May 31, 2015. The inability to provide the requested letter regarding your medical staff status at College Station Medical Center resulted in Dr. Garant covering your on-call assignment. Your call assignment was made in March 2015.
>
> (2) Your refusal to take assigned call on June 4, 2015. Your counsel's letter dated June 3, 2015 insisted that you be able to return to your clinical practice "no later than 9:00am Thursday June 4 2015" and we received the requested letter regarding your medical staff status at College Station Medical Center. Your call assignment for

June 4, 2015 was made in April 2015.  Your email to Dr. Smith June 4, 2015 shows a refusal to take your assigned call.  As a result, Dr. Zivney covered your responsibilities.

(3) Your inability to perform assigned duties.  The text message to Dr. Smith on 6/5/2015 states that you will "not exercise your hospital privileges."  You are unable to perform the duties directed by the association by not exercising your hospital privileges.

(4) Your email June 7, 2015 confirming that you will not exercise your clinical privileges at CSMC.

(5) Your refusal to take assigned call on June 8, 2015.  Your call assignment for June 8, 2015 was made in April 2015.

(Docket Entry No. 36, Ex. 33).

The burden then shifted back to Dr. Poole to present evidence that raises a fact dispute as to whether those reasons were a pretext for disability discrimination.

## 2.    Pretext

Affiliates argues that it properly terminated Dr. Poole based on her refusal to perform on-call duties.  It contends that Dr. Poole has not presented any evidence, other than "her own subjective belief that she was discriminated against," to rebut the reasons set out in the June 8 termination letter.  (Docket Entry No. 36 at 19).

Dr. Poole has presented evidence creating a factual dispute as to whether Affiliates's proferred reasons were a pretext for disability discrimination.  The record presents factual disputes material to deciding whether and when Affiliates knew about Dr. Poole's PTSD diagnosis; whether Dr. Poole was able to perform on-call duties between June 2 and June 8 pending the ad hoc committee's resolution; and whether Dr. Poole was believed in good faith to be impaired on May 21.  These disputes are material to determining whether the reasons Affiliates gave for firing her were a pretext for discrimination against her disability.  In the meetings Dr. Poole recorded between

18

May 21 and June 7, the Affiliates doctors questioned whether her prescriptions were legitimate, discounted her explanation and PTSD diagnosis, and referred to "experience with addiction" in accusing Dr. Poole of being a drug addict, rather than an individual with a disability. Instead of engaging in an interactive process with Dr. Poole, Dr. Garant stated:

> And yes, it absolutely has crossed my mind that there's something about your character that I find very suspicious sometimes, and I wonder about you and I wonder what you're thinking and what kind of influences medications might be having on you. . . . The truth is there's a lot that's gone on, all these events, the hand cutting, the dog eating the ball, there's just so much drama, there's so many events that happen in your world all the time that are just so crazy that I just sit back and I wonder, what is the deal? Like it just doesn't make sense. I don't know anybody else like that, Rebecca.

(Docket Entry No. 37, Ex. 17 at 124).

The record contains conflicting evidence as to Affiliates's reasons for terminating Dr. Poole. The June 8 termination letter sets out nondiscriminatory reasons for terminating Dr. Poole, including her refusal to perform on-call duties. Dr. Poole cites evidence that Drs. Garant, Smith, and Zivney did not believe that she had PTSD, believed that she was taking addictive narcotics, and denied her requests for reasonable accommodations. Because there are factual disputes material to determining whether Affiliates's nondiscriminatory reasons for terminating Dr. Poole were a pretext for disability discrimination, summary judgment on this issue is denied.

### B. The Retaliation Claim

A *prima facie* case of retaliation requires the plaintiff to show "(1) engagement in an activity protected by the ADA, (2) an adverse employment action, and (3) a causal connection between the protected act and the adverse action." *Seaman v. CSPH, Inc.*, 179 F.3d 297, 301 (5th Cir. 1999) (footnotes omitted). A request for a reasonable accommodation is a protected activity under the Act. *See EEOC v. Chevron Phillips Chem. Co., L.P.*, 570 F.3d 606, 621 n.9 (5th Cir. 2009) ("Every

appeals court to consider [whether requesting an accommodation is a protected activity] has concluded that it is protected as long as the employee had the reasonable belief that he was covered by the ADA.").

Dr. Poole argues that she was terminated in retaliation for her protected activity of asking Dr. Garant to exchange an on-call shift with her. She requested the shift change because she had broken her foot, "in part due to [her] losing sleep as a result of her PTSD." (Docket Entry No. 37 at 23). She points to evidence that Dr. Garant called the Hospital, reported that Dr. Poole "may be using too many narcotic medications," and eventually caused Dr. Poole to be terminated. Dr. Poole also points to evidence that she would not have been terminated if Affiliates had provided a reasonable accommodation for her disabilities by allowing her to work a temporary modified on-call schedule. That is enough to for a *prima facie* showing of a causal connection between the protected activity and the adverse employment action. As with the discrimination claim, Dr. Poole has made a *prima facie* showing of retaliation, and Affiliates has offered nondiscriminatory reasons for her termination. The factual disputes material to the disability-discrimination claim are also material to determining whether Affiliates's reasons for terminating Dr. Poole were a pretext for retaliation. Summary judgment on this issue is denied. The retaliation claim may go forward.

### C.     The Breach-of-Contract Claim

Affiliates argues that Dr. Poole's breach-of-contract claim fails as a matter of law because she did not perform the terms of her employment agreement requiring her to take on-call assignments. It points to the record evidence showing that Dr. Poole refused to take on-call assignments on seven different days—May 29, 30, 31, and June 4 and 8. The employment agreement states that Affiliates could terminate Dr. Poole for "fail[ing] or refus[ing] to perform

faithfully and diligently the duties of employment and comply with the provisions of this Agreement." (Docket Entry No. 36, Ex. 3).

Dr. Poole does not dispute that she refused to perform on-call duties. Instead, she points to the agreement provisions that the on-call assignments "shall be rotated among the employees of the Association in a *reasonable* manner" and that the Association "may from time to time *reasonably* direct . . . on duty and on call assignments . . . ." (*Id.*) (emphasis added). Dr. Poole argues that it was not reasonable for Affiliates to deny her requests to alter her schedule while her staff privileges were under review by the Hospital's ad hoc committee. Dr. Poole also points out that Dr. Garant's report to the emergency room caused the ad hoc committee's review.

It is undisputed that Dr. Poole did not perform the agreement terms covering on-call hours. But there are factual disputes material to deciding whether Affiliates acted reasonably by not changing the on-call schedule to account for the ad hoc committee's review of her Hospital staff privileges. Because those disputes are material to the breach-of-contract claim, summary judgment is denied.

## IV.    Conclusion

Affiliates's motion for summary judgment, (Docket Entry No. 36), is denied.

SIGNED on July 30, 2018, at Houston, Texas.

Lee H. Rosenthal
Chief United States District Judge