**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| DR. REBECCA POOLE-WARD, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-17-885 |
| | § | |
| AFFILIATES FOR WOMEN'S | § | |
| HEALTH, P.A., | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM & OPINION

Affiliates for Women's Health, P.A., has moved to strike the expert opinion of Dr. Edgar P. Nace, a psychiatrist specializing in substance-abuse disorders, keeping from the jury at trial Dr. Nace's opinion that Dr. Rebecca Poole-Ward did not have a substance-abuse disorder before, during, or after her employment with Affiliates. Affiliates argued that his opinion is irrelevant and unreliable, that he proffers legal conclusions, and that he improperly characterizes witness testimony and opines as to witness credibility. Dr. Poole-Ward responded that Dr. Nace's testimony is relevant, based on reliable methodology, contains no legal conclusions, and neither characterizes witness testimony nor assesses witness credibility. The court heard oral argument on the motion, struck Dr. Nace's legal conclusions, ordered him to supplement his report, and allowed an additional deposition, deferring ruling on relevance, reliability, and the other issues pending those steps.

Dr. Nace supplemented his report, concluding again that Dr. Poole-Ward has no history of substance-abuse disorder. Affiliates maintains that Dr. Nace's opinion is still irrelevant, unreliable, and offers improper opinions that mischaracterize witness testimony and opine as to witness credibility. Dr. Poole-Ward asserts that Dr. Nace's opinions are relevant, reliable, accurately characterize witness testimony, and do not opine on witness credibility. The court heard oral

argument a second time. The parties disputed the timeline of events underlying the lawsuit, and the court ordered them to submit timelines. Both parties did so.

After a careful review of the motions, responses, expert reports, supplements, record evidence, and applicable law, the court denies the motion to strike, but enters a limine order as set out below. (Docket Entry Nos. 43, 66, 81). Dr. Nace may testify as to his opinion that Dr. Poole-Ward did not have a substance-abuse disorder during her employment with Affiliates, but not before or after, and subject to a limiting instruction. Any other opinions may not be presented to the jury in any way without first approaching the bench and obtaining leave to do so. Dr. Nace may not characterize witness testimony or assess witness credibility, and any such opinions are stricken. The reasons for these rulings are explained in detail below.

## I.    Background

Affiliates is an obstetrics and gynecology clinic in College Station, Texas. It has three partners, Dr. Michele Garant, Dr. Randy Smith, and Dr. Ben Zivney. In addition to seeing patients at the clinic, the Affiliates physicians perform deliveries and surgeries at a hospital, College Station Medical Center. The Affiliates physicians had to maintain unrestricted privileges to practice at the Hospital. Dr. Garant served as the Hospital's chief obstetrician.

In August 2014, Affiliates hired Dr. Poole-Ward as a non-partner physician. Before joining Affiliates, Dr. Poole-Ward had been diagnosed with Attention Deficit Hyperactivity Disorder and migraines. From July 2014 to November 2014, she had prescriptions filled for Percocet, a pain medication containing opioids. In January 2015, she was written an Oxycodone prescription (500 mL) for migraines. In February 2015, Dr. Poole-Ward informed Affiliates that she had been sexually assaulted. After the assault, Dr. Poole-Ward was diagnosed with Post-Traumatic Stress

Disorder. Dr. Joseph Roman, her primary-care physician at the time, gave Dr. Poole-Ward a 30-dose prescription for Clonazepam, a sleeping medication containing benzodiazepine. Dr. Poole-Ward filled the Clonazepam prescription twice, in April and May 2015. Dr. Poole-Ward also filled her Oxycodone prescription, each time for 500 mL, in January, February, March, and April 2015.

In late February, not long after the sexual assault, Dr. Poole-Ward met with Dr. Michele Garant and Dr. Ben Zivney, two of the three Affiliates partners, about Dr. Poole-Ward's behavior and performance at work. (Docket Entry No. 36-10). Dr. Zivney had received reports from Affiliates medical staff that Dr. Poole-Ward "was making them very uncomfortable with her personal information" regarding the sexual assault. (*Id.*). The Affiliates partners told Dr. Poole-Ward to "have appropriate personal boundaries with staff at [Affiliates] at all times." (*Id.*). A patient had filed a complaint about Dr. Poole-Ward with the Texas Medical Board. (*Id.*). Before drafting a reply, Dr. Poole-Ward had asked the nurses who witnessed the events underlying the patient's complaint to provide "detailed written accounts" of what they saw, because she "just thought it would help." (*Id.*). The partners reminded Dr. Poole-Ward of "the seriousness of any [Texas Medical Board] complaint and the importance of a complete and thoughtful reply to the [Texas Medical Board] by her own hand rather than on relying on others to do so." (*Id.*).

Lastly, Dr. Poole-Ward had not been timely in visiting patients during rounds or in writing up her notes. (*Id.*). When asked why, Dr. Poole-Ward responded: "I just forgot, I have no excuse." (*Id.*). The partners responded "in the strongest possible terms that [Dr. Poole-Ward] is expected to make rounds on all patients in a timely manner and to complete her work faithfully both in the hospital and in the office during her [employment] with [Affiliates]." (*Id.*). At the meeting's conclusion, "it was strongly suggested to Dr. Poole that she seek appropriate help for her alleged

attack last weekend from law enforcement and from a qualified therapist." (*Id.*).

In March 2015, Dr. Roman wrote in her medical records:

[Dr. Poole-Ward] used a lot of oxycodone over the last month and this is concerning. A pain contract was signed today but instructed that we are going to slowly move away from that medication as one used to treat migraines. . . . [Dr. Poole-Ward] assures me that she does not use the medication (oxycodone) if she will be working.

(Docket Entry No. 62-2 at 15).

On May 21, Affiliates nurses told Dr. Garant that Dr. Poole-Ward seemed especially tired and was slurring her words during patient examinations. Dr. Garant checked on Dr. Poole-Ward, but did not speak with her because she was with a patient. Sometime that afternoon, Dr. Poole-Ward fell off her office chair and hurt her foot. Dr. Poole-Ward worked the remainder of the day. She went to the Hospital's emergency department around 10:00 p.m.

After she arrived at the Hospital, Dr. Poole-Ward called Dr. Garant and asked to have someone cover her on-call assignment that evening. Dr. Garant agreed, but became concerned after Dr. Poole-Ward seemed not to understand her. Dr. Garant called Dr. Poole-Ward's emergency-department physician and expressed the concern that Dr. Poole-Ward "may be using a lot of narcotics and recommended [a urine drug screen]." (Docket Entry No. 38-1 at 4). The emergency-department physician attempted to get a urine sample, but Dr. Poole-Ward said that she could not urinate and refused a catheter. (*Id.*).

To reduce her foot pain, Dr. Poole-Ward asked for 2 milligrams of Dilaudid, a potent opioid, but the emergency-department physician suggested that they start with 1 milligram. (*Id.*). That night, Dr. Poole-Ward received 4 milligrams of Dilaudid. She left the emergency department at 2:40 a.m. on May 22 with an ankle-sprain diagnosis and a prescription for Ultram, a pain medication containing Tramadol. (*Id.* at 5).

On May 22, Dr. Poole-Ward met with the Affiliates partners to discuss the May 21 incident. The partners voiced concerns about what the nurses had observed and reported about Dr. Poole-Ward's confusion and sleepiness with patients. The partners asked Dr. Poole-Ward if she was taking prescription medication. Dr. Poole-Ward responded that she took Adderall for ADHD and that she had been prescribed Clonazepam, but had stopped taking it two weeks earlier. Dr. Poole-Ward stated that she had pain medication, prescribed for past surgeries and for migraines, but that she had not been taking it. She did not mention taking Oxycodone or other opiates. Dr. Poole-Ward told the partners that she was tired on May 21 because she had delivered a baby that night, stayed up late doing "personal stuff," and had trouble sleeping because her husband was out of town. (Docket Entry No. 82-4 at 17, 19–20). The partners remained concerned, and Dr. Garant suggested that "we need to do a urine drug screen on you." (*Id.* at 14).

Around 11:40 p.m. on May 22, Dr. Poole-Ward met with Charles Hall, the Hospital's assistant chief nurse, and submitted a urine sample for the drug screen. (Docket Entry No. 82-6). Before giving the sample, Dr. Poole-Ward asked: "So just to be clear, I mean, my partners aren't going to be involved in this, right? I mean – I mean, they'll – I mean, I assume they know what's going on, but like not intimately involved. It's like extremely embarrassing." (*Id.* at 3). The initial drug screen, verified at 11:55 p.m. on May 22, was positive for opiates, amphetamines, benzodiazepines, and Oxycodone. (Docket Entry No. 83-2 at 6). Charles Hall sent the initial results to the Hospital's chief executive officer, Larry Rodgers, at 12:40 a.m. on Saturday, May 23. (*Id.*).

On May 23, Dr. Garant, in her capacity as chief obstetrician of the Hospital, called Larry Rodgers to report Affiliates's concerns that Dr. Poole-Ward might be impaired. (Docket Entry No. 37-4 at 4). Dr. Garant testified that she and her partners were obligated to do so under the Hospital's

Bylaws, based on the observations and reports from the Hospital's and clinic's medical staff. (*Id.*). The Hospital's Bylaws stated that: "[i]f any individual in the hospital has a reasonable suspicion that a licensed independent practitioner . . . appointed to the Medical Staff is impaired . . . [a]n oral, or preferably, a written report shall be given to the Chief Executive Officer or the Chief of Staff." (Docket Entry No. 36-35 at 2).

That Monday, May 26, Larry Rodgers and Dr. Rajesh Harrykissoon, the Hospital's chief medical officer, met with Dr. Poole-Ward around 10:00 a.m. (Docket Entry No. 37-18). They told Dr. Poole-Ward that the Hospital had received a "concern for impairment." (*Id.* at 4). They told her that under the Hospital's Bylaws she could self-report a substance-abuse problem. If not, under the Hospital's Bylaws and Texas law, the Hospital had to report the impairment concern and the drug screen to the Texas Medical Board. (*Id.* at 4–5).

Later that day, Dr. Poole-Ward met with the Affiliates partners, who had not seen or heard the initial drug-screen results. The partners asked about her prescription medications and what the drug screen would show. Dr. Poole-Ward said that it would show opiates, because of Diluadid she had received at the Hospital for her foot, and Oxycodone, because she took a dose when she got home from the Hospital on May 22. (Docket Entry No. 37-19). Dr. Poole-Ward told the partners that she had two prescriptions for 500 mL of Oxycodone from Dr. Roman, "[t]o have at home if [she] needed it." (*Id.* at 7–8). Dr. Poole-Ward said that she needed Oxycodone on May 22 to manage her foot pain, even after taking the Diluadid. (*Id.* at 8). A medical examination of her ankle on May 26 had shown "an avulsion with two ligaments at least torn off." (*Id.*).

Dr. Smith asked, with Dr. Poole-Ward present, what the Hospital would do given the drugs that would be present in her urine drug screen. (*Id.* at 15). Dr. Garant replied:

> Well, I think they have a reasonable suspicion that she was impaired on Thursday, and I think that they're going to suspend her privileges until she can show that she's entered (Inaudible) program of some type where she follows through and makes sure that she has whatever program they give her to clear her, she has clear drug screens for whatever amount of time, counseling and evaluation, and she – whatever she'll have to go through.

(*Id.* at 16). Dr. Poole-Ward asked: "What reasonable suspicion do they have?" Dr. Garant said that the Hospital "won't tell us" because "they have to keep it privileged." (*Id.*). Later in the meeting, Dr. Garant stated:

> So Rebecca, would it be fair to say that you were possibly impaired on Thursday, because you're suffering from lack of sleep and a short-term mental illness because of stress that you've been through, and perhaps it isn't necessarily drug induced, but perhaps it's more induced by what you've had to go through.

(*Id.* at 20). Dr. Poole-Ward responded that "I could agree with that." (*Id.*).

As to the Hospital, Dr. Garant said:

> There's just so many things we don't have answers to, Rebecca . . . . So I don't know, and that's part of the problem, you know, between – you know, between us and – and Larry and Raj is that, you know, there's – there's stuff they won't say, and, then again, it's such a weird little position that we're in, because I'm chief of [obstetrics], and there's things that they have to tell me and things that they have to ask, but at the same time they try not to tell me, because, you know, we're, you know, in the same group, and so it's a very little strange and precarious situation.

(*Id.* at 21). The partners took Dr. Poole-Ward's office keys and informed her she could not practice at the clinic until the situation was sorted out. The partners told Dr. Poole-Ward that before she could resume her clinic duties, they wanted confirmation that she had unrestricted Hospital privileges. (*Id.* at 23; Docket Entry No. 36-17).

The next day, on May 27, Dr. Poole-Ward met with Larry Rodgers and Dr. Harrykissoon at the Hospital. (Docket Entry No. 37-20). Dr. Harrykissoon suggested that because "there's a concern of impairment on the table, it would be reasonable to maybe take a break from clinical

contact until we get further guidance.  Whether or not guidance is within 24 hours or a week." (*Id.* at 4–5).  Dr. Poole-Ward responded: "[Affiliates's] thing is I can work if I have hospital privileges." (*Id.* at 5).  Dr. Harrykission replied: "I think taking the week would be reasonable.  Reasonable, and I bet within this week we probably will have further guidance like . . . do you come back shorter than the week or do we need to consider a longer duration, . . . you know, kind of a voluntary leave." (*Id.*).

On May 29, Dr. Poole-Ward took a voluntary leave from the Hospital.  (Docket Entry No. 37-21 at 5–7).  If she had not done so, the Hospital would have formally suspended her privileges. (*Id.*).  On June 1, the Hospital's Medical Executive Committee initiated an investigation into the reported impairment concerns, forming a committee composed of Dr. Lane Miller, Dr. Dawn Riordan, and Dr. Craig Steiner. (Docket Entry No. 36-38 at 2).  The Hospital Bylaws permitted the Hospital's Chief Executive Officer and Chief of Staff to request an investigation if they found "sufficient information to warrant further investigation" after meeting with the person who reported the impairment concern.  (Docket Entry No. 36-35 at 2).  The committee asked Dr. Poole-Ward to attend its June 5 meeting at 2:00 p.m.

On June 2, the Hospital sent Affiliates a letter stating that "Dr. Poole is currently on a voluntary leave of absence from the Medical Staff.  The Medical Staff Bylaws state that a physician on a leave of absence shall not be permitted to provide any patient care services in the Hospital or provide any call coverage."  (Docket Entry No. 36-18).

On June 3, Dr. Poole-Ward's lawyer sent a letter to Dr. Randy Smith, one of the Affiliates partners, stating that Dr. Poole-Ward's confirmed (not initial) urine drug screen was negative, because, although she had opioids and other drugs in her system, she had prescriptions for those

drugs. (Docket Entry No. 82-8). The confirmed drug screen stated that Dr. Poole-Ward had taken opiates, amphetamines, benzodiazepines, and Oxycodone, with prescriptions.

The next day, June 4, Larry Rodgers sent Affiliates a letter confirming Dr. Poole-Ward's unrestricted Hospital privileges. (Docket Entry No. 82-10). The letter stated that Dr. Poole-Ward "maintain[s] unrestricted clinical privileges and Medical Staff membership at the Hospital. In addition, [Dr. Poole-Ward] clarified that it was not [her] intent to request a formal leave of absence from the Medical Staff." (Docket Entry No. 36-20 at 3). Dr. Smith texted Dr. Poole-Ward: "Rebecca, Thanks for the letter – that's awesome." (Docket Entry No. 82-11 at 2). Dr. Smith emailed Dr. Poole-Ward a formal letter from Affiliates, confirming that she could resume her responsibilities and her duties that day, June 4. (Docket Entry No. 82-13 at 3). Dr. Smith instructed Dr. Poole-Ward to "notify the charge nurse in labor and delivery and the nursing administrator to inform them that you will be taking call for the group" for the night of June 4, as originally scheduled. (*Id.*).

On June 4, after seeing the Hospital's letter, Dr. Garant texted Dr. Poole-Ward: "Great news Rebecca! I saw the letter Larry [Rodgers] sent regarding your unrestricted clinical privileges at the hospital. I was planning on checking out to Ben [Zivney] tonite [sic] as I am leaving for vacation. As you are on call for the practice I will check out to you instead." (Docket Entry No. 82-12 at 2). Dr. Poole-Ward responded: "Ben is still on call." (*Id.*) When Dr. Garant asked why, Dr. Poole-Ward responded: "I will be happy to talk with you tomorrow." (*Id.*). Later that night, Dr. Poole-Ward emailed Dr. Smith:

> I am notifying you that I am not take [sic] hospital call tonight. . . . The letter from [Larry Rodgers] is absolutely truthful, as my hospital privileges remain unchanged.

My lawyer spoke with the hospital lawyer today to have this letter written and specifically confirmed its validity. At that time it was suggested by the hospital's lawyer that until my [investigation committee] meeting tomorrow afternoon it would be in good faith to not see patients in the hospital. Because of the late time this evening you asked me to take call, it is unreasonable and not possible for me to reach [sic] or clarify this with the parties involved, hospital lawyer or [Larry Rodgers]. Since I had no response from [Affiliates], everyone involved did not feel this to become a problem and not worth arguing over. . . . I would love to take call tonight but I would hope that you agree with me that it is reasonable and important to not intentionally undermine all the forward progress I have made. Out of respect for those involved, even though it may not make sense (as I too agree) given the hospital's clear statements in the letter, I feel I should not jeopardize this and need to respect the request relayed to me today. I anticipate these circumstances will be resolved within 24 hours.

(Docket Entry No. 82-14 at 2).

On June 5, Dr. Smith and Dr. Zivney, the third Affiliates partner, asked Dr. Poole-Ward to meet with them "to go over the call schedule." (Docket Entry No. 82-15 at 2). Dr. Poole-Ward agreed to meet at 4:00 p.m., or when her meeting with the investigation committee ended. (*Id.*). Around 5:00 p.m., Dr. Smith and Dr. Poole-Ward exchanged text messages:

[Dr. Poole-Ward:]
The meeting has concluded. I will continue to voluntarily not exercise my hospital privileges until after the [investigation] committee comes back with their decision at their request. Please send me any changes that your make [sic] on the call schedule.

[Dr. Smith:]
So are you meeting with Ben [Zivney] and I?

[Dr. Poole-Ward:]
No. I don't have any additional information to offer you. The conditions discussed last night are still in place and Larry [Rodgers] can verify that for you. I am working hard to resolve this.

[Dr. Smith:]
Rebecca,
You have on-call duties and responsibilities on Monday June 8, 2015. Michele [Garant] will be out of the office all next week. Ben [Zivney] already took call for you Thursday June 4th when you could not fulfill your on-call duties. There have been no changes to the call schedule for June. The June call schedule was provided

to you in April. Will you be able to fulfill your on-call duties at the hospital on Monday June 8, 2015?

(Docket Entry No. 82-15 at 3–4).

Affiliates repeatedly asked Dr. Poole-Ward to take her on-call duties assigned on June 8.

Dr. Poole-Ward maintained that she could not. (*Id.* at 4–11). On June 7, Dr. Smith and Dr. Zivney

met with Dr. Poole-Ward to discuss why she could not take her on-call assignments. Dr. Poole-Ward

told them:

> The current problem in addressing the call schedule is that the hospital and their attorney have set up a catch 22 situation. The hospital has provided a letter dated 6/4 and signed by the CEO, Larry Rogers [sic], that clearly states that my hospital privileges are fully intact, without any restrictions; however, the hospital's attorney, through verbal communication with mine, stated that my privileges would be suspended if I stepped in the hospital to treat a patient before the [investigation] committee had time to meet and fulfill their recommendations.
>
> I still do not understand how the hospital can make a written statement and then immediately counter it with a verbal statement for which I am pursuing this.
>
> I did not and do not want to challenge this position that the hospital is taking. It has a potential to not only affect my further ability to practice my profession and cloud my reputation, but also the reputation of [A]ffiliates. I do not want this to occur.
>
> I do remain fully ready to assume clinical duties. I'm willing to take and answer all answering service calls. Let me be clear, I have inquired with the hospital multiple times, and their formal statement is that I have unrestricted privileges.

(Docket Entry No. 37-22 at 6–7). The Affiliates partners asked Dr. Poole-Ward if she thought she

was breaching her employment obligations by failing to take on-call responsibilities. (*Id.* at 15–18).

Dr. Poole-Ward said that she was not. The partners inquired how she would "feel about resigning

and then being rehired" because "[t]hen we don't have to stress about" when the investigation

concluded. (*Id.* at 18). Dr. Poole-Ward rejected that idea, stating that "there's no guarantee" that

Affiliates would rehire her. (*Id.* at 18). The partners replied: "We need to know if you are going to

11

cover your on call assignment that includes hospital care and we need to know that by 7:00 in the morning [of June 8]." (Docket Entry No. 82-16 at 4). Dr. Poole-Ward said that she would respond "[a]s soon as I can and before I go to bed." (*Id.* at 5). That evening, Dr. Poole-Ward emailed Dr. Smith: "I maintain that I can not [sic] exercise my privileges at [the Hospital], while I await the [investigation] committee's decision, or get clarification from the CEO/attorney of the hospital system." (Docket Entry No. 82-17 at 2).

On June 8, Affiliates terminated Dr. Poole-Ward's employment for refusing to take her on-call assignments on May 29–31 and on June 4 and 8. (Docket Entry No. 82-18 at 2).

On June 9, the day after the termination, Dr. Poole-Ward retained Dr. Nace to perform a psychiatric evaluation. Dr. Nace interviewed Dr. Poole-Ward on June 9 and June 18. He spoke with Roger Ward, Dr. Poole-Ward's husband, for 30 minutes by phone on June 22. He reviewed a number of documents, including her drug-screen results and her reports of conversations with the Hospital and Affiliates. Dr. Nace issued his report on June 29, a month after the termination. He stated that:

> Dr. Rebecca Poole does not have a substance use disorder currently or in her past. The events of May 21 – 22, 2015 are related to the painful foot injury she received, and the subsequent expectable stress. There is no indication that she was impaired in any way regarding the practice of medicine and, in fact, arranged for one of her physician partners to take call on the night of her injury.

(Docket Entry No. 83-3 at 8). Dr. Nace did not opine on the effects of Dr. Poole-Ward's combined insomnia, drugs, stress, and other factors on her work with patients on May 21.

In August 2015, the Hospital investigation committee concluded that "Dr. Poole does not currently suffer from an impairment or other wellness issue that would affect her ability to practice pursuant to the Medical Staff Impaired Practitioner Policy." (Docket Entry No. 37-14).

Dr. Poole-Ward sued Affiliates in March 2017. (Docket Entry No. 1). She alleged that

Affiliates had discriminated against her on the basis of her disability, before June 8, by denying reasonable requested accommodations for ADHD, PTSD, and migraines during her employment. (*Id.*). According to Dr. Poole-Ward, Affiliates's reason for terminating her employment was a pretext for disability discrimination. (*Id.*). Dr. Poole-Ward asserted discrimination and retaliation claims under the Americans with Disabilities Act and a state-law breach-of-contract claim. (*Id.*). Affiliates answered, denying any discrimination or retaliation against Dr. Poole-Ward, and raising affirmative defenses. (Docket Entry No. 5).

In June 2018, Affiliates moved for partial summary judgment, and Dr. Poole-Ward responded. (Docket Entry Nos. 36–37).[1] After considering the parties' arguments, the record evidence, and the applicable law, the court denied the motion, finding that there were genuine factual disputes, including disputes material to determining whether Affiliates's nondiscriminatory reasons for terminating Dr. Poole-Ward were pretexts for discrimination or retaliation. (Docket Entry No. 40).

Affiliates has moved to strike the expert testimony of Dr. Nace, who Dr. Poole-Ward has designated as a Rule 702 witness to testify on whether she had a substance-abuse disorder during her employment at Affiliates and on her emotional distress from the termination. (Docket Entry No. 44). Affiliates contends that Dr. Nace's testimony is neither relevant nor reliable, that he offers only legal conclusions, and that he would invade the jury's role by characterizing witness testimony and assessing witness credibility. (*Id.*). Dr. Poole-Ward responded that Dr. Nace formed his opinion through established psychiatric practices, made no legal conclusions, and neither characterized testimony nor assessed witness credibility. (Docket Entry No. 52). Dr. Poole-Ward argued that Dr.

---

[1] Affiliates moved to compel arbitration under the employment agreement. (Docket Entry No. 7). The court granted the motion and ordered arbitration, (Docket Entry No. 20), and Dr. Poole-Ward appealed the arbitration order, but on appeal, the parties agreed to litigation, (Docket Entry No. 26). The Fifth Circuit dismissed the appeal and remanded the case. (Docket Entry No. 27).

Nace's opinion was relevant to the drug-abuse allegations that formed the basis for terminating Dr. Poole-Ward. (Docket Entry No. 52). The court granted the Affiliates's motion in part, striking Dr. Nace's legal conclusions, but deferring ruling on relevance, reliability, or the other issues until Dr. Nace addressed deficiencies in the reliability of his opinions, including by reviewing pharmaceutical records, which he had not done previously, and supplementing his report. (Docket Entry No. 58).

Dr. Nace reviewed depositions, letters, litigation documents, meeting minutes, medical and pharmaceutical records, mental-health evaluations, and notes of his interview with Dr. Poole-Ward and of his phone conversation with Dr. Poole-Ward's husband. (Docket Entry No. 62-2). He neither spoke with the individuals who saw Dr. Poole-Ward's behavior on May 21 nor those who contacted Dr. Poole-Ward's primary-care physicians. Dr. Nace read the depositions of the Affiliates nurses, Dr. Garant, Dr. Smith, Dr. Harrykissoon, and other Affiliates staff. (*Id.* at 5). The supplemented report included Dr. Poole-Ward's pharmaceutical records and the conclusion that: "[t]hese prescribing records indicate an appropriate modest to minimal use of potentially addicting medications. The records do not support that a dependency or addiction was occurring with Dr. Poole-Ward." (*Id.* at 19). Dr. Nace further concluded:

> Rebecca Poole-Ward, M.D. has not in the past and does not currently carry a diagnosis of a substance use disorder. This opinion was previously expressed in my report[s] of June 29, 2015 and February 26, 2018. Since then, I have reviewed the August 27, 2015 letter from the Medical Board of College Station Medical Center's [investigation] committee that Dr. Poole was found not to have been impaired or have any wellness issues as a result of that investigation and was cleared by the [investigation] committee to practice medicine in the hospital without restriction. As indicated in my report . . . of June 29, 2015, which was part of the ad hoc committee investigation, Dr. Poole scored "low probability of having a substance use disorder" on the Substance Abuse Subtle Screening Inventory-3. Further, while the above ad hoc investigation was occurring in the spring and summer of 2015, Dr. Poole had a confirmed all-negative drug screen, and there have been no credible reports or any

indications of subsequent substance misuse, abuse, or dependence based upon my review of multiple independent sources of information, medical records, and prescription records. To that end, there was only one source of information that indicated the presence of narcotics in Dr. Poole's system, the unconfirmed [urine drug screen] results. However the unconfirmed [urine drug screen] results did not take into account the prescriptions that Dr. Poole had or the pain medication that she was given less than 24 hours before, as a result of her foot injury on May 21, 2015. The unconfirmed [urine drug screen] results, by its own terms, do not and would not impact my opinion that Dr. Poole does not have a diagnosis of a substance use disorder.

(*Id.* at 62-2 at 19–20).

Affiliates amended its motion to strike, contending that the supplemented report still failed to meet the relevance or reliability requirements. Because Affiliates terminated Dr. Poole-Ward for refusing to take on-call assignments, not a substance-abuse disorder, Affiliates contended that Dr. Nace's testimony is irrelevant. The impairment allegations against Dr. Poole-Ward, Affiliates argue, could involve a factor or combination of factors other than substance abuse. Affiliates argued that Dr. Nace's opinion is unreliable because he did not interview or speak with important witnesses, including Dr. Roman. Affiliates maintained that Dr. Nace improperly characterized testimony and assessed witness credibility.

Dr. Poole-Ward responded that Dr. Nace's opinion is relevant because Affiliates used substance-abuse impairment allegations to establish a pretext for terminating Dr. Poole-Ward. As to reliability, Dr. Poole-Ward contended that Dr. Nace reviewed the available medical and pharmaceutical records, depositions, and meeting minutes, and that he had no need to interview additional witnesses. In an affidavit submitted with the response, Dr. Nace stated that he had received additional pharmaceutical records from Dr. Poole-Ward, and that those records did not change his opinions. (Docket Entry No. 73-1).

The court heard argument during docket call in November 2019. The parties agreed the jury

issue is "whether, as of the date and time [when Dr. Garant reported her concern that Dr. Poole-Ward was impaired], there was a reasonable basis for believing that [Dr. Poole-Ward] might be impaired for whatever reason." (Docket Entry No. 85 at 15). They agreed that Dr. Nace cannot testify as to whether Dr. Garant, who had heard concerns from the clinic medical staff working with Dr. Poole-Ward about her sleepiness and communication problems in seeing patients on May 21, had a good-faith concern that Dr. Poole-Ward may have been impaired on May 21. (*Id.* at 16). The court stated: "All he can speak to is whether, based on the records he saw at the time, he thought that she didn't, in fact, have a drug abuse [problem]." (*Id.*).

Affiliates counsel argued that this case concerned only whether Dr. Poole-Ward had a good-faith basis to suspect that Dr. Poole-Ward was impaired on May 21, not whether she had a substance-abuse disorder, and urged the court to avoid a "minitrial" on that issue "when it's not, ultimately, relevant." (*Id.* at 18–19, 22). Dr. Poole-Ward contended that Dr. Nace's testimony is relevant to Affiliates's impairment concern because it could include substance abuse. In Dr. Poole-Ward's view, Dr. Nace's opinion would help the jury in deciding whether Dr. Garant had a good-faith basis to believe that Dr. Poole-Ward was impaired on May 21 from taking drugs by themselves or in combination with other factors. The parties then discussed the timeline of events, informing the court that Dr. Nace did not become involved until June 9, after Dr. Poole-Ward's termination. The court deferred ruling on the motion "to rethink this in terms of relevance, probative value, [and] risk of confusing the jury," (*id.* at 45), given that while the presence of a diagnosis of a substance-abuse disorder on May 21 would be clearly relevant, an opinion as to the absence of the diagnosis, given the presence of opiates in Dr. Poole-Ward's system, is less clearly relevant.

The court asked the parties to submit a timeline of the events leading to Dr. Poole-Ward's

termination, and both did so.  (Docket Entry Nos. 81–83).  With those timelines, and the supplemented record, the court considers the parties' arguments in detail below.

## II.    The Standard of Review

Under Federal Rule of Evidence 702, a witness may provide expert opinion testimony if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods of the facts to the case.

FED. R. EVID. 702; *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999).  *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), provides the framework for analyzing whether, when, and to what extent expert testimony is admissible under that rule.  "In *Daubert*, the Supreme Court 'explained that Rule 702 assigns to the dsistrict judge a gatekeeping role to ensure that scientific testimony is both reliable and relevant.'" *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012) (per curiam) (quoting *Curtis v. M & S Petro., Inc.*, 174 F.3d 661, 668 (5th Cir. 1999)). The party offering the expert opinion must establish admissibility by a preponderance of the evidence.  *Sims v. Kia Motors of Am., Inc.*, 839 F.3d 393, 400 (5th Cir. 2016); *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 385 (5th Cir. 2009).

To be relevant, expert testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue." *Weiser–Brown Operating Co. v. St. Paul Surplus Lines Ins. Co.*, 801 F.3d 512, 529 (5th Cir. 2015) (quotation omitted).  Reliability, a separate requirement, concerns "whether the reasoning or methodology underlying the testimony is scientifically valid." *Carlson v. Bioremedi Therapeutic Sys.*, 822 F.3d 194, 199 (5th Cir. 2016) (quoting *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 233–44 (5th Cir. 2002)).  To be reliable, expert testimony must "be grounded in the

17

methods and procedures of [the applicable] science and be more than unsupported speculation or subjective belief." *Arkema*, 685 F.3d at 459 (quotation and alteration omitted); *see also Huss v. Gayden*, 571 F.3d 442, 460 (5th Cir. 2009) ("Courts must be arbiters of truth, not junk science and guesswork."). To establish reliability, an expert must furnish "some objective, independent validation of [his] methodology." *Brown v. Ill. Cent. R.R. Co.*, 705 F.3d 531, 536 (5th Cir. 2013) (quotation omitted) (alteration in original). "The expert's assurance that he has utilized generally accepted [principles] is insufficient." *Id.* (quotation omitted) (alteration in original); *see also Kumho Tire*, 526 U.S. at 157 (the court is not required to "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert" (quotation omitted)). It is the trial court's responsibility "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152. The court must evaluate "whether the expert is a hired gun or a person whose opinion in the courtroom will withstand the same scrutiny that it would among his professional peers." *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 991 (5th Cir. 1997)

"[A]n expert is permitted wide latitude to offer opinions, including those that are not based on first hand knowledge or observation." *Daubert*, 509 U.S. at 592. "[T]he basis of an expert's opinion usually goes to the weight, not the admissibility, of the testimony." *Fair v. Allen*, 669 F.3d 601, 607 (5th Cir. 2012). Occasionally, "the source upon which an expert's opinion relies is of such little weight that the jury should not be permitted to receive that opinion." *Id.* "Expert opinion testimony falls in this category when that testimony would not actually assist the jury in arriving at an intelligent and sound verdict." *Id.* "Cross-examination at trial, however, is the proper forum for

discrediting testimony, and credibility determinations are, of course, the province of the jury." *Dearmond v. Wal–Mart La. LLC*, 335 F. App'x 442, 444 (5th Cir. 2009); *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 562–63 (5th Cir. 2004); *United States v. 14.38 Acres of Land, More or Less Situated in Leflore Cty., Miss.*, 80 F.3d 1074, 1077 (5th Cir. 1996).

A district court has discretion in determining the admissibility of expert testimony under Rule 702, *Daubert*, and subsequent cases. *Arkema*, 685 F.3d at 458–59. The district court "has broad discretion to determine whether a body of evidence relied upon by an expert is sufficient to support that expert's opinion." *Id.* (quoting *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 354 (5th Cir. 2007)); *see also Kumho Tire*, 526 U.S. at 152 ("[T]he trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable.").

## III. Analysis

As a threshold matter, Dr. Nace may not characterize witness testimony, assess witness credibility, present opinions based on clearly incorrect assumptions, or offer legal conclusions. A district court may admit expert testimony to help "the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702(a). "An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." *Id.* 703. "As a general rule, an expert may not opine on another witness's credibility because this testimony does not help the trier of fact, who can make its own credibility determinations." *Nagle v. Sheriff Marlin Gusman*, No. 12-1910, 2016 WL 541436, at *4 (E.D. La. Feb. 11, 2016) (citing *United States v. Hill*, 749 F.3d 1250, 1260 (10th Cir. 2014)); *see also Engesser v. Dooley*, 457 F.3d 731, 736 (8th Cir. 2006); *Nimely v. City of New York*, 414 F.3d 381, 397–98 (2d Cir. 2005). "The jury is solely responsible for

determining the weight and credibility of the evidence." *United States v. Williams*, 132 F.3d 1055, 1059 (5th Cir. 1998).

Dr. Nace's statement that "there have been no *credible* reports or any indications of subsequent substance misuse, abuse, or dependence based upon my review of multiple independence sources of information" (Docket Entry No. 62-2 at 19–20 (emphasis added)), is stricken, because it opines as to the credibility of the medical staff who saw Dr. Poole-Ward on May 21. Dr. Nace opined that "there was only one source of information that indicated the presence of narcotics in Dr. Poole's system, the unconfirmed [urine drug screen] results." (*Id.*). The court strikes this statement because it is factually incorrect. Dr. Poole-Ward had narcotics in her system on May 21 and 22. She had prescriptions for them, but they were in her system.

Affiliates did not tell Dr. Poole-Ward in June 2015, and it does not claim now, that it terminated Dr. Poole-Ward's employment because it believed that she had a substance-abuse disorder. Affiliates told Dr. Poole-Ward in June 2015, and asserts in this litigation, that it terminated her employment because she refused to take on-call assignments after her Hospital privileges had been reinstated. Dr. Poole-Ward alleges that she wanted to take on-call assignments, but could not because after Dr. Garant's report that she "may be using a lot of narcotics," the Hospital had to investigate. (Docket Entry No. 38-2 at 4). During the investigation, Dr. Poole-Ward alleges, she could not exercise Hospital privileges, even though the Hospital issued a letter on June 4 confirming that she had unrestricted privileges. She alleges that contrary to the letter, she in fact could not treat patients in the Hospital until after the investigation committee reached its conclusion.

On June 8, Affiliates terminated Dr. Poole-Ward for the stated reason that she refused to take on-call assignments despite the letter stating that she had full privileges. Dr. Poole-Ward's

employment agreement permitted Affiliates to terminate her for refusing to "perform faithfully and diligently the duties of employment," including taking on-call assignments. (Docket Entry No. 7-1 at 2, 6).

The critical issue is whether Affiliates believed in good faith that Dr. Poole-Ward was impaired while she was treating patients on May 21, or whether it made that allegation in a bad-faith pretext for disability discrimination. *Sagaral v. Wal-Mart Stores Tex. LP*, 516 F. Supp. 2d 782, 798 (S.D. Tex. 2007) (quoting *Waggoner v. City of Garland, Tex.*, 987 F.2d 1160, 1165–66 (5th Cir. 1993)); *see, e.g.*, *Lujan v. Exide Techs.*, No. 10-4023, 2012 WL 380270, at *20 (D. Kan. Feb. 6, 2012) ("Mr. Lujan must produce enough evidence to call into question whether Exide honestly believed he could not perform his job as a COS Operator, not that he could in fact perform his job."). The question is whether Affiliates told the Hospital of its concerns in a good faith-belief that Dr. Poole-Ward may have been impaired on May 21, not whether Affiliates was correct about that belief. A second, related issue is whether on June 8, Affiliates knew that Dr. Poole-Ward did not in fact have Hospital privileges and could not take on-call assignments.

Dr. Nace opines on whether Dr. Poole-Ward had a substance abuse disorder before, during, or after her employment with Affiliates. The court must answer whether that opinion is relevant and, if so, whether Dr. Nace formed his opinions through a reliable method.

### A.    Relevance

An expert's testimony "must be relevant, not simply in the sense that all testimony must be relevant, FED. R. EVID. 402, but also in the sense that the expert's proposed opinion would assist the trier of fact to understand or determine a fact in issue." *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584 (5th Cir. 2003). "Relevance depends upon whether [the expert's] reasoning or methodology

can be applied to the facts in issue." *Kirby Inland Marine*, 482 F.3d at 352 (quotation omitted). The expert testimony must "fit" the case's facts. *Daubert*, 509 U.S. at 591. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Id.* (quotation omitted).

Dr. Nace's testimony is an awkward fit with the issues before the jury. The central issue is whether Affiliates had a good-faith basis to believe that Dr. Poole-Ward was impaired on May 21, by medication alone or in combination with other factors such as insomnia, stress, or the conditions the medications were intended to treat. The record shows that Affiliates reported its concerns to the Hospital, which caused Dr. Poole-Ward to take voluntary leave from the Hospital and have her Hospital privileges restricted, pending investigation. Because Dr. Poole-Ward could not perform her on-call responsibilities while her Hospital privileges were restricted, she could not take on-call duty to fulfill her employment agreement. Dr. Poole-Ward asserts that Affiliates knew her Hospital privileges remained restricted after June 8. Affiliates states that they did not terminate Dr. Poole-Ward until after her Hospital privileges had been restored and she still refused to take her on-call assignments. Dr. Nace's opinions are irrelevant to this issue.

Dr. Nace seeks to testify that Dr. Poole-Ward did not have a clinical substance-abuse disorder during her employment at Affiliates. His testimony is relevant if it calls into question the good-faith basis of Affiliates's belief that Dr. Poole-Ward was impaired by combined factors that included prescription medication or other drugs. *See Exide Techs.*, 2012 WL 380270, at *20 ("The essential thrust of the putative expert opinions is whether Mr. Lujan could in fact perform his job—a fact that is relevant only to the extent it calls into question Exide's honest belief in firing him."). Dr. Nace's testimony does not bear on Affiliates's good-faith basis, or lack of one, to suspect that Dr. Poole-Ward was impaired on May 21. It tells the jury nothing about the May 21 incidents, or what

Affiliates knew about Dr. Poole-Ward in the days, weeks, and months before that date. It does shed some light on the likelihood of her abusing prescription drugs during her employment.

In the May 22 and May 26 meetings with Dr. Poole-Ward, the Affiliates partners repeated their concerns over reports from nurses that Dr. Poole-Ward was impaired in ways that medications, including taking medications as prescribed, could cause or contribute to causing. Their questions show a concern that Dr. Poole-Ward might have taken prescription medications to an extent that, by themselves or in combination with other factors, it affected her patient interactions and care. Dr. Nace's opinion that Dr. Poole-Ward did not have a substance-abuse disorder removes that basis of support for Affiliate's concerns and actions. The opinion goes to a factor, although far from the only or most important one, in deciding whether Affiliates had a good-faith, even if wrong, belief that Dr. Poole-Ward was impaired on May 21, 2015. The opinion is sufficiently relevant to be admissible, with the proper limiting instructions. Dr. Nace's opinion that Dr. Poole-Ward did not have a substance-abuse disorder before or after her Affiliates employment is not relevant, because it would not help the jury determine any of the material factual disputes.

Admitting Dr. Nace's testimony risks misleading the jury and confusing the issues. *See* FED. R. EVID. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . confusing the issues, misleading the jury . . . ."). The issue is not whether Dr. Poole-Ward actually had a substance-abuse disorder or was impaired on May 21. The jury will be instructed that Dr. Nace's opinion, if credited, may be considered as one factor bearing on a limited issue: Affiliates's good faith in reporting its concerns to the Hospital.

### B.     Reliability

A district court must consider whether expert testimony is reliable. *Pipitone*, 288 F.3d at 244.

Reliability requires that: (1) the testimony is based on sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the expert has reliably applied the principles and methods to the facts of this case. FED. R. EVID. 702(b)–(d); *see Centralian Controls PTY, Ltd. v. Maverick Int'l, Ltd.*, No. 1:16-cv-37, 2018 WL 1602948, at *3 (E.D. Tex. Feb. 9, 2018). In *Daubert*, the Supreme Court made "'general observations' intended to guide a district court's evaluation of scientific evidence," including "whether it has been subjected to peer review and publication,' the 'known or potential rate of error,' and the 'existence and maintenance of standards controlling the technique's operation,' as well as 'general acceptance.'" *Watkins*, 121 F.3d at 989 (quoting *Daubert*, 509 U.S. at 598, 593–94). These factors apply to both scientific and non-scientific testimony. *Id.* at 991. The reliability test "is 'flexible,' and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire*, 526 U.S. at 141. The district court has "broad latitude" to determine "*how* to determine reliability." *Id.* at 142 (emphasis in original).

"The party seeking to have the district court admit expert testimony must demonstrate that the expert's findings and conclusions are reliable, but need not show that the expert's findings and conclusions are correct." *Bocanegra*, 320 F.3d at 585. The "trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." *14.38 Acres of Land*, 80 F.3d at 1078. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* (quoting *Daubert*, 509 U.S. at 152). Generally, "questions relating to the bases and sources of an expert's opinion affect the *weight* to be assigned that opinion rather than its *admissibility* and should be left for the jury's consideration." *Primrose*, 382 F.3d at 562 (emphasis in original) (quoting *14.38 Acres of Land*, 80 F.3d at 1077). A court may not "judge the expert conclusions themselves."

*Williams v. Manitowoc Cranes, LLC*, 898 F.3d 607, 623 (5th Cir. 2018) (quotation and emphasis omitted).

Dr. Nace based his testimony on his personal observations, document review, professional experience, education, and training. The court "must probe into the reliability of these bases when determining whether the testimony should be admitted." *Pipitone*, 288 F.3d at 247. Dr. Nace failed to speak with important witnesses and did not detect inconsistencies between Dr. Poole-Ward's statements and her medical records. For example, he neither spoke with Dr. Roman nor detected that Dr. Poole-Ward had filled Percocet and Oxycodone prescriptions more recently than she represented to Affiliates. The question is whether these problems make his expert opinion so unreliable as to be inadmissible, or "shaky" but admissible. *Primrose*, 382 F.3d at 562 (quotation omitted). The court finds his testimony to be "shaky but admissible." *Id.*

Dr. Poole-Ward began her employment with Affiliates on August 1, 2014. Affiliates terminated her employment less than a year later on June 8, 2015. During her employment, Dr. Poole-Ward filled 11 prescriptions for scheduled narcotics: two for Percocet, four for Oxycodone, two for Hydrocodone, one for Tramadol, and two for Clonazepam. She filled two additional Percocet prescriptions in July 2014, between 5 and 15 day supplies, before she started work.

Dr. Poole-Ward's medical and pharmaceutical histories support an inference that Dr. Poole-Ward made misstatements to Affiliates in the May 22 and 26 meetings. Between August 2014 and June 2015, Dr. Poole-Ward filled prescriptions for scheduled medications in July, September, November, January, February, March, April, May, and June. In March, Dr. Poole-Ward's primary-care physician, Dr. Joseph Roman, wrote in her medical records that "she used a lot of oxycodone over the last month and this is concerning." (Docket Entry No. 62-2 at 15). Dr. Roman noted that

Dr. Poole-Ward signed a "pain contract," agreeing to "slowly move away from that medication as one used to treat migraines."  (*Id.*).

On May 22, 2015, when the Affiliates partners met with Dr. Poole-Ward to discuss the May 21 incidents, they asked her about prescription medications she had filled or taken.  Dr. Poole-Ward told them: "I have pain medicine.  I'm sure I have it in my house but I have not been taking it." (Docket Entry No. 82-4 at 8).  Dr. Poole-Ward's pharmaceutical records show that she filled Oxycodone prescriptions in January, February, March, and April, and a Hydrocodone prescription in February.  Dr. Poole-Ward said that she received this pain medication after surgery or for migraines.  (*Id.* at 9–10).  Dr. Nace's report does not list a single surgery that Dr. Poole-Ward had in 2014 or 2015.  Dr. Poole-Ward mentioned that Dr. Roman prescribed her Clonazepam after her sexual assault, but that she was not taking it.  (*Id.* at 7).  Her pharmaceutical records show that she filled that prescription twice, the last time on May 11.  When asked about Percocet, Dr. Poole-Ward responded: "I know I haven't taken it since I started my job.  I think I may have taken a dose when I first got here."  (*Id.* at 13).  She said that she "had a prescription filled before [she] came [to Affiliates]."  (*Id.*).  Dr. Poole-Ward's pharmaceutical records show that she filled two Percocet prescriptions during her employment at Affiliates, in September and November, and twice in the month before she started work, on July 1 and July 8.  While Dr. Poole-Ward said that she had not recently taken Clonazepam, a benzodiazepine, her drug screen showed otherwise.  She did not tell Affiliates about the Hydrocodone.

On May 26, the partners held a second meeting with Dr. Poole-Ward, following her initial drug screen, but before Affiliates knew the results.  The record does not contain the full meeting minutes.  According to Dr. Nace's report, the Affiliates partners questioned Dr. Poole-Ward about

what her urine drug screen would show. Dr. Poole-Ward represented that it would show opiates in her system, because "she took her prescribed oxycodone prescription after she returned from the emergency room [early in the morning on May 22], and that Dr. Roman had given her a refill on the oxycodone two or three months earlier." (Docket Entry No. 62-2 at 17). Dr. Poole-Ward had actually refilled her Oxycodone prescription a month earlier, in April, and it was prescribed for migraines, not her ankle injury. Dr. Poole-Ward also filled a Hydrocodone prescription sometime on May 26.

Dr. Poole-Ward's initial drug screen showed a positive result for opiates, amphetamines, benzodiazepines, and Oxycodone. (Docket Entry No. 62-1 at 6). The confirmed drug-screen verified the presence of the drugs in Dr. Poole-Ward's system but changed the results for those drugs to negative based on valid prescriptions. Dr. Poole-Ward still had Oxycodone in her system, the same drug that her primary-care physician worried about her overusing it enough to have her sign a pain contract. In the May 22 meeting, Dr. Poole-Ward did not reveal to Affiliates that she had taken Oxycodone when she got home from the Hospital on May 22. She did not tell the Affiliates partners that she had filled four Oxycodone prescriptions and two Hydrocodone prescription in the last few months, or that she had signed a pain contract to take less Oxycodone. She did not tell them that she had recently taken Clonazepam, as her drug screen indicated.

Dr. Nace, in reaching his conclusion, neither mentioned nor apparently considered any inconsistencies between Dr. Poole-Ward's statements to Affiliates and her pharmaceutical records. It is worrisome that Dr. Nace failed to compare Dr. Poole-Ward's statements about her drug consumption on May 20 to May 22 to her pharmaceutical history.

Dr. Nace described the May 22, 2015, meeting as "compris[ing] a lengthy questioning of Dr.

Poole, as well as accusations that she had a drug problem, with Dr. Poole repeatedly responding that she did not have a drug problem." (Docket Entry No. 62-2 at 17). He made no mention of discrepancies between what Dr. Poole-Ward told Affiliates and her pharmaceutical history. As to the May 26 meeting, Dr. Nace said that "Dr. Poole was questioned about prescriptions and medications." (*Id.*). Dr. Nace noted that Dr. Poole-Ward told Affiliates that "Dr. Roman had given her a refill on the oxycodone two or three months earlier." (*Id.*). He did not point out that she had already refilled her Oxycodone prescription in April. Dr. Nace concluded, without elaboration, that Dr. Poole-Ward's pharmaceutical records "indicate an appropriate modest to minimal use of potentially addicting medications. The records do not support that a dependency or addiction was occurring." (*Id.* at 19).

Dr. Nace stated that "Rebecca Poole-Ward, M.D. has not in the past and does not currently carry a diagnosis of a substance use disorder." (*Id.*). He based this opinion on:

- the August 27, 2015, Hospital letter concluding that Dr. Poole-Ward was neither impaired nor had wellness issues;
- a June 29, 2015, mental-health evaluation concluding Dr. Poole-Ward had a "low probability of having a substance abuse disorder";
- the confirmed urine drug screen showing a negative result because there were prescriptions for the drugs found in her system; and
- the absence of reports indicating "subsequent substance misuse, abuse, or dependence."

(*Id.* at 19–20). The August 27 letter stated only that Dr. Poole-Ward "does not currently suffer from an impairment or other wellness issue that would affect her ability to practice pursuant to the Medical Staff Impaired Practitioner Policy." (Docket Entry No. 37-14). The June 2015 mental-health evaluation occurred after Dr. Poole-Ward's employment. The negative confirmed urine-drug screen showed opiates, amphetamines, benzodiazepines, and Oxycodone, which Dr. Poole-Ward admitted to taking for a purpose other than the one prescribed. The absence of substance-abuse reports after

Dr. Poole-Ward's termination is of scant relevance.

To be admissible, Dr. Nace's testimony must rest on enough information to be reliable. The court does not look at the conclusions on the merits, but at whether the expert used a reliable method in forming them. *Manitowoc Cranes*, 898 F.3d at 623; *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1392 (5th Cir. 2003) ("[I]t is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony."). Affiliates argues that Dr. Nace did not base his opinion on sufficient information because he did not speak with important witnesses, like Dr. Roman.

Dr. Nace considered Dr. Poole-Ward's medical and pharmaceutical histories; reviewed depositions of individuals who encountered Dr. Poole-Ward on May 21; read letters from those who interacted with Dr. Poole-Ward during her employment; studied meeting minutes, emails, and text messages; and examined the Hospital's investigation report. Dr. Nace did not contact Dr. Roman or the emergency-room doctor who treated Dr. Poole-Ward on May 21, as perhaps he should have, but he did review their notes. He reviewed a range of information and, based on his professional experience and training as a psychiatrist, concluded that Dr. Poole-Ward did not use excessive prescribed medications and did not have a substance-abuse disorder. Those conclusions are the product of sufficient information to be admissible. Dr. Nace's testimony will be open to cross-examination and introduction of contradictory evidence. Affiliates may examine him about inconsistencies in Dr. Poole-Ward's statements, and why he did not speak with Dr. Roman or the emergency-department physician. Affiliates may introduce contradictory evidence from those sources, subject to evidentiary rules. The adversarial presentation allows the jury to decide what weight to give Dr. Nace's expert testimony.

Affiliates argues that Dr. Nace relied on information only from Dr. Poole-Ward to draw his

conclusions, creating "a 'common-sense skepticism' regarding the expert's evaluation." *Munoz v. Orr*, 200 F.3d 291, 301–02 (5th Cir. 2000) (quotation omitted).  While Dr. Nace interviewed Dr. Poole-Ward and examined her statements, he also reviewed many documents—including her medical and pharmaceutical records, her communications, and witness testimony.  Dr. Nace reviewed enough evidence "to verify the information presented to him." *Munoz*, 200 F.3d at 302; s*ee also* FED. R. EVID. 702 advisory comm. note ("The emphasis on . . . 'sufficient facts or data' is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other").  Dr. Nace based his opinion on a reliable process—reviewing the available records and testimony—and examined sufficient information.  His testimony is admissible, subject to limiting instructions and to cross-examination.

## V.      Conclusion

Dr. Nace may testify only as to whether Dr. Poole-Ward had a substance-abuse disorder during her employment at Affiliates and as to Dr. Poole-Ward's emotional harm from her termination.  He may not characterize witness testimony or assess witness credibility.  He may not opine whether, on May 21, 2015, Affiliates had a good-faith basis to report its concern that Dr. Poole-Ward was impaired while seeing patients.  The court grants and denies in part Affiliates's motion to strike Dr. Nace's expert testimony.  (Docket Entry Nos. 43, 66, 81).

SIGNED on December 19, 2018, at Houston, Texas.

Lee H. Rosenthal
Chief United States District Judge